UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | )| |
|---|---|---|
|UNITED STATES OF AMERICA,| )| |
| | )| |
|v.| )| No. 1:16-cr-00154 (KBJ)|
| | )| |
|LUZ IRENE FAJARDO CAMPOS,| )| |
| | )| |
|Defendant.| )| |
| | )| |

**MEMORANDUM OPINION**

Defendant Luz Irene Fajardo Campos ("Fajardo Campos" or "Defendant"), who resided in Mexico until the time of her arrest in this matter, has been charged with one count of conspiring to distribute cocaine, methamphetamine, and marijuana, knowing that those drugs would be imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b) and 963. This indictment was the result of a long-term investigation that the Drug Enforcement Administration ("DEA") had conducted regarding Fajardo Campos's alleged drug trafficking activities and connections to a notorious drug trafficking organization. As part of that investigation, on April 24, 2013, the government submitted an application to the United States District Court for the District of Arizona pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90–351, 82 Stat. 197, 211–25 (codified as amended at 18 U.S.C. §§ 2510–2522) ("Title III"), seeking authorization to intercept Fajardo Campos's electronic communications to and from her BlackBerry cellular telephones.[1] The

---

[1] For the purpose of Title III, "electronic communications" are non-voice communications that are made over cellular phone or other networks, and include things such as e-mail, text messages, and Blackberry Messenger messages. *See* 18 U.S.C. § 2510(12).

federal district court in Arizona approved the government's application, and that court subsequently granted both extensions to the requested wiretap period and additional wiretap authorizations, such that the surveillance of Fajardo Campos's electronic communications extended over nearly 29 months.

Before this Court at present is Fajardo Campos's motion to suppress the electronic communications that the government intercepted as a result of the Arizona federal court's orders. (*See* Def.'s Mot. to Suppress Intercepted Elec. Commc'ns ("Def.'s Mot."), ECF No. 33.) Fajardo Campos argues that the interceptions of her communications should be suppressed for three independent reasons. First, she maintains that the government's applications did not establish that intercepting her electronic communications was "necessary" within the meaning of Title III. (*See id.* at 14–20.)[2] Second, she argues that the interceptions took place at BlackBerry's servers *in Texas*, and therefore the Arizona federal court lacked territorial jurisdiction to issue the surveillance orders. (*See id.* at 20–24.) Third, and finally, Fajardo Campos insists that the interceptions of her communications violated her Fourth Amendment rights because the government's applications did not sufficiently specify the communications that the government was seeking to intercept. (*See* Def.'s Reply in Supp. of Mot. to Suppress ("Def.'s Reply"), ECF No. 38, at 13–14.)

For the reasons explained below, this Court has concluded that Fajardo Campos's motion to suppress must be **DENIED**. In short, this Court has determined that the government has shown that traditional law enforcements methods were insufficient to elucidate the entire scope of the alleged drug trafficking conspiracy—which satisfies

---

[2] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

2

Title III's necessity requirement—and that the federal court in Arizona had Title III "listening post" jurisdiction to authorize surveillance of Fajardo Campos's Blackberry messages. This Court also finds that the government's surveillance applications were sufficiently specific to satisfy the strictures of the Fourth Amendment. A separate Order consistent with this Memorandum Opinion will follow.

## I. BACKGROUND

### A. The Underlying Facts[3]

In January of 2012, the DEA coordinated with the Federal Bureau of Investigation and the Internal Revenue Service to launch an investigation into a drug trafficking organization ("DTO") that was operating in Mexico and in Tucson, Arizona, among other places. (*See* Aff. in Supp. of Application to Intercept Elec. Commc'ns ("Apr. 2013 Aff."), ECF No. 37-2 ¶ 12.) According to investigators, "a leader of the Sinaloa Cartel[] ha[d] placed [Fajardo Campos] in charge of [this] DTO [which] operate[d] from Hermosillo, Sonora, Mexico, to southern Arizona and other places in the United States." (*Id.* ¶ 13.) DEA agents utilized a variety of techniques to investigate the illegal organization—*e.g.,* they worked with confidential sources (*see id.* ¶ 14), conducted pen register surveillance of Fajardo Campos's phone line (*see id.* ¶¶ 24–29), physically surveilled her associates when those associates visited the United States (*see id.* ¶ 37), obtained a search warrant for an e-mail account she used (*see id.* ¶ 42), and secured authorization to place a geo-tracking device on an airplane that they believed she used to traffic narcotics (*see id.* ¶ 43). The Mexican government was

---

[3] This summary of facts regarding the government's surveillance applications and methods are drawn from the various memoranda that the parties have filed, and the exhibits thereto.

3

contemporaneously investigating Fajardo Campos's alleged drug trafficking activities, and shared some of its information with the DEA (*see id.* ¶ 38), including certain transcripts of telephone calls recorded pursuant to a wiretap that a Mexican court had authorized and information regarding Mexico's surveillance of her (*see id.* ¶ 50). Nevertheless, according to the government, these methods were ineffective to reveal the entirety of the DTO's membership and its operating methods and current activities, primarily because Fajardo Campos's inner circle was believed to be composed of family members, close friends, and long-standing associates (*see id.* ¶ 32), and because her associates, who primarily operated in Mexico, were part of a violent cartel that had influence on Mexican government officials (*see, e.g.*, *id.* ¶¶ 33, 36, 42). For these same reasons, the government also believed that other techniques that it had in its own investigative toolkit—such as search warrants, trash pulls, or undercover officers— likewise would be ineffective or prohibitively dangerous. (*See id.* ¶¶ 33, 39–40, 46– 48.)

Consequently, on April 24, 2013, government investigators requested authorization from the federal district court for the District of Arizona to intercept electronic communications (i.e., text messages, emails, BlackBerry Messenger messages, and the like) that were made from a particular BlackBerry device that Fajardo Campos was using (referred to in the application as "Target Device #1"). (*See* Application for Interception of Elec. Commc'ns ("Apr. 2013 Appl."), ECF No. 37-2 at 17–25.) In this application and the attached affidavit, the government detailed its investigative efforts to date and explained why it believed it needed to supplement these efforts with electronic surveillance. (*See generally id.*; Apr. 2013 Aff.) In addition, it

4

provided technical details about how the interceptions would occur; specifically, the government explained that Fajardo Campos's communications would be "captured through RIM/Blackberry Corporation's server located in Texas[,]" and then automatically sent to a DEA server in Virginia. (Apr. 2013 Aff. ¶ 10(a).) From there, the communications would be "automatically forward[ed] . . . to specialized equipment located at the DEA Tucson, Arizona Division, where the messages are first received and reviewed by law enforcement agents and/or foreign language interpreters under law enforcement supervision." (*Id.*; *see also id.* ¶ 10(d) (explaining that "[a]ll monitoring of the interceptions over the TARGET DEVICES will be performed in Tucson, Arizona").) The government further represented that agents reviewing the intercepted communications would employ "minimization" procedures, and that communications that were not relevant to the investigation would not be shared with the investigative team. (*See id.* ¶¶ 52–53.)

On April 24, 2013, based on representations that the communications would "first be heard and minimized" in the District of Arizona (Order Authorizing Interception of Elec. Commc'ns, ECF No. 37-2, at 5), and upon finding that "normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ," (*id.* at 4), the Arizona federal district court issued an order granting the Title III wiretap application and authorizing the interceptions of Target Device #1 for a period of no more than 30 days (*see id.* at 5). This same court granted two extensions of the surveillance thereafter (*see* Def.'s Mot. at 6–7), and then, on July 29, 2013, that court also approved the government's request to monitor a different BlackBerry device—Target Device #7—

5

that government investigators believed Fajardo Campos was using in lieu of the Target Device #1 (*see id.* at 7).

The government requested and received eight extensions of the court's authorization to intercept communications over Target Device #7 before seeking approval to intercept communications over Target Device #17, which the government believed Fajardo Campos began using in lieu of Target Device #7. (*See id.* at 7–9.) The court granted and extended this approval six times (*see id.* at 9), and the government then requested and received authorization to resume interceptions of Target Device #7; the court subsequently extended *that* authorization ten times as well (*see id.* at 11–13). Then, on August 3, 2015, the Arizona federal court authorized the government to intercept communications over a fourth BlackBerry device that it believed Fajardo Campos was using—Target device #60. Finally, on September 2, 2015, the government ceased all interceptions of Fajardo Campos's devices. (*See* Gov't's Resp. to Def.'s Mot. ("Gov't Opp'n"), ECF No. 36, at 3.)

In each of the Title III wiretap applications that were submitted to the federal court in Arizona, the government detailed the progress of its investigation and averred that continuing interceptions were necessary in order to determine the full scope of the DTO. (*See, e.g.*, Aff. in Supp. of Application to Intercept Elec. Commc'ns ("Aug. 2015 Aff."), ECF No. 37-3, at 54–241, ¶¶ 70–202 (detailing results of alternative investigative techniques).)

### B. The Current Proceedings

On August 30, 2016, a federal grand jury in the District of Columbia returned an indictment charging Fajardo Campos with one count of conspiring to manufacture and distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine,

6

and 1,000 kilograms of marijuana for importation into the United States in violation of 21 U.S.C. §§ 959(a), 960(b) and 963. (*See* Indictment, ECF No. 1.) Fajardo Campos filed the instant motion to suppress the wiretap evidence on August 30, 2018. (*See* Def.'s Mot.)[4]

As noted above, in her suppression motion Fajardo Campos asserts that the government's applications did not establish that intercepting her electronic communications was "necessary" within the meaning of Title III, because other less intrusive means of gathering evidence were available to law enforcement officers (who were in fact using such alternative methods with success). (*See id.* at 14–20.) In addition, she argues that the Arizona federal court lacked territorial jurisdiction to issue the Title III surveillance orders because the interception occurred at Blackberry's servers in Texas, when her messages were first copied and then forwarded to government servers, and not in Arizona, where law enforcement officers first reviewed the contents of the messages. (*See* Def.'s Mot. at 20–24 (citing 18 U.S.C. § 2518(3)).)

The government opposes Fajardo Campos's motion, arguing that the electronic surveillance was "necessary" under governing D.C. Circuit precedent because traditional investigative techniques were insufficient to reveal the entire scope of the conspiracy. (*See* Gov't Opp'n at 6.) The government further maintains that because law enforcement officers first read the intercepted messages in Arizona, the Arizona court had territorial jurisdiction to authorize the interceptions under Title III (*id.* at 22–27), and that even if it did not, there is no statutory basis under Title III to suppress these materials (*see id.* at 17–21). In response to these arguments, Fajardo Campos

---

[4] The indictment was sealed at the time that the grand jury issued it; the Court unsealed it on January 12, 2018. (*See* Minute Entry of January 12, 2018, unsealing indictment.)

makes her third and final contention: that the wiretaps should be suppressed for the independent reason that the interceptions of her communications violated her Fourth Amendment rights because the government's applications contained insufficient details as to the time, place, and nature of the interceptions for which it sought authorization. (*See* Def.'s Reply in Supp. of Mot. to Suppress ("Def.'s Reply"), ECF No. 38, at 13–14.)

The Court heard oral argument on Fajardo Campos's suppression motion on October 11, 2018. After the hearing, the Court ordered supplemental briefing on the standard of review, and instructed the government to submit to the Court "all of the extension authorizations" for the interceptions at issue. (Order, ECF No. 41.)

## II. LEGAL STANDARDS

### A. Interception Of Electronic Communications Under Title III

Title III lays out a detailed procedure for law enforcement officers to follow in order to obtain court authorization for the interception of wire, oral, or electronic communications, which is otherwise a felony and subject to civil penalties. *See* 18 U.S.C. §§ 2511, 2520. Title III defines an "intercept" as the "aural or other acquisition of the contents of any . . . communication[,]" *id.* § 2510(4), and a federal judge has jurisdiction to authorize the "interception" of communications "within the territorial jurisdiction of the court in which the judge is sitting[,]" *id.* § 2518(3). Among other things, an application for a wiretap must lay out "the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued," *id.* § 2518(1)(b), and "a full and complete statement as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[,]" *id.* § 2518(c).

"[B]efore issuing the *ex parte* wiretap order, as requested or modified, a judge must make certain determinations based on the facts submitted by the applicant, including that the wiretap is necessary to the investigation, and that there exists probable cause to believe that the phone to be tapped is or will soon be used in connection with particular enumerated criminal offenses." *United States v. Scurry*, 821 F.3d 1, 7 (D.C. Cir. 2016) (internal citations omitted). With respect to the "necessity" for surveillance in particular, a Title III authorization order must include a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]" 18 U.S.C. § 2518(3)(c). And, notably, when deciding a motion to suppress, "[a] district court gives deference to the authorizing judge's necessity determination." *United States v. Glover*, 681 F.3d 411, 419–20 (D.C. Cir. 2012), *aff'g sub nom.*; *see also United States v. Suggs*, 531 F. Supp. 2d 13, 18 (D.D.C. 2008) (reviewing issuing judge's findings regarding necessity for the wiretap for abuse of discretion); *United States v. Eiland*, 398 F. Supp. 2d 160, 173 (D.D.C. 2005) (explaining that "[a]n issuing judge's finding of necessity is reviewed for abuse of discretion), *aff'd*, 738 F.3d 338 (D.C. Cir. 2013).

### B. The Fourth Amendment's Particularity Requirement

The Fourth Amendment not only commands that a warrant issue only "upon probable cause, supported by Oath or affirmation," but also requires that any such warrant "particularly describ[e] the place to be searched, and the persons or things to be seized." *Berger v. New York*, 388 U.S. 41, 55 (1967) (quoting U.S. Const. amend. IV). "In the wiretap context, those requirements are satisfied by identification of the

telephone line to be tapped and the particular conversations to be seized." *United States v. Donovan*, 429 U.S. 413, 427 n.15 (1977); *see, e.g.*, *United States v. Savoy*, 883 F. Supp. 2d 101, 118 (D.D.C. 2012) (upholding wiretap application that identified the target cell phone number, suspected user, and likely communications, among other information), *rev'd in part on other grounds sub nom. Scurry*, 821 F.3d at 5. When a district court reviews an issuing judge's determination that a wiretap request is sufficiently particular with respect to the line to be tapped and the conversations to be seized, it appears that the reviewing judge evaluates the particularity issue de novo. *See United States v. Gaines*, 639 F.3d 423, 432 (8th Cir. 2011) (affirming district court's de novo review of issuing court's particularity finding).[5]

## III. ANALYSIS

This Court has reviewed the briefs that the parties have filed, and has also considered the materials that the government submitted to the Arizona federal district court in connection with its requests to surveil Fajardo Campos's electronic communications. As explained below, this Court has determined that Fajardo Campos has not presented any legal basis for suppression of the results of this surveillance. Specifically, this Court finds that the Arizona federal court did not abuse its discretion in finding that the wiretap was necessary under Title III, and that the Arizona court had

---

[5] A district court reviewing a motion to suppress evidence obtained through a Title III wiretap on Fourth Amendment grounds may well review the issuing court's *particularity* determination under a different standard than it reviews the issuing court's *probable cause* determination. *See United States v. Fannin*, 817 F.2d 1379, 1381 (9th Cir. 1987) (describing differing standards of review for probable cause (substantial basis) and particularity (de novo)); *see also United States v. Holland*, 41 F. Supp. 3d 82, 97 (D.D.C. 2014) (noting that, when reviewing the issuing court's probable cause determination, "[i]t is the duty of [the district court] to ensure that the judge issuing the wiretap order had a substantial basis for concluding that probable cause existed" (internal quotation marks and alterations omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983))). Because this Court finds that the wiretap request at issue here was sufficiently particular under the more probing de novo standard, it would reach the same result through substantial basis review.

10

territorial jurisdiction to authorize the surveillance. In addition, this Court concludes that the wiretap applications and authorizations are in accord with the Fourth Amendment.

> **A. The Arizona Court Did Not Abuse Its Discretion When It Determined That Interception Of Defendant's Electronic Communications Was Necessary Within The Meaning Of Title III**

Title III's requirement that an issuing judge find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous[,]" 18 U.S.C. § 2518(3)(c)—such that wiretapping is a necessary tool with respect to the investigation at issue—is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). "In assessing the necessity of a wiretap application, courts must give close scrutiny to applications challenged for noncompliance and reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *United States v. Williams*, 827 F.3d 1134, 1147 (D.C. Cir. 2016) (alterations, internal quotation marks, and citation omitted), *cert. denied sub nom. Edwards v. United States*, 137 S. Ct. 706 (2017). Nevertheless, it is clear beyond cavil that Title III's necessity requirement "was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *United States v. Carter*, 449 F.3d 1287, 1294 (D.C. Cir. 2006) (internal quotation marks and citation omitted). Indeed, the D.C. Circuit has long recognized that a court may authorize Title III surveillance "if traditional investigative techniques have proved inadequate to reveal the operation's full 'nature and scope.'" *United States v. Brown*, 823 F.2d 591, 598

(D.C. Cir. 1987) (quoting *United States v. Williams*, 580 F.2d 578, 590 (D.C. Cir. 1978)).

Here, each of the original applications and extension requests included details about the government's efforts to investigate the DTO and Fajardo Campos's involvement with it, and Defendant does not challenge the accuracy of these accounts. Instead, Fajardo Campos insists that, given the successes that the government had with traditional investigative techniques, it should have waited longer for the results of those techniques to "ripen" before seeking authorization to intercept Fajardo Campos's electronic communications (Def.'s Reply at 4), and that those interceptions should have ceased long before they actually did, because the government had gathered what defense counsel believes was sufficient information (*see id.* at 9 (arguing that "within the first two months of the wiretap the government had sufficient success to terminate the interception")).

Unfortunately for Fajardo Campos, the mere fact "that traditional investigative techniques had yielded some evidence against the [] defendant[]" is insufficient to foreclose a Title III authorization where the affidavit supporting the Title III application establishes "that these techniques had failed—and would likely continue to fail—to disclose the *full nature and extent* of the conspiracy" of which the target is alleged to be a part. *Brown*, 823 F.2d at 598–99 (emphasis added); *see also United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989) (rejecting argument that "the government failed to investigate [the defendant] adequately before resorting to the wiretap"). And the affidavits that the government submitted in connection with the instant allegations clearly make representations of the sort that the circuit courts have found sufficient to

justify a Title III authorization. *Compare United States v. Becton*, 601 F.3d 588, 596 (D.C. Cir. 2010) (finding that district court did not abuse its discretion in authorizing a wiretap where affidavits explained that "normal investigative procedures had been probative in proving that an ongoing illegal narcotics business was operating, [but] the FBI had been unable to determine the identities of other co-conspirators who supplied and transported drugs into D.C. and who assisted in local redistribution[,]" and that the "drug redistribution operation was extremely close-knit, involving close associates and family" (alterations, internal quotation marks, and citations omitted)), *with* Aug. 2015 Aff. ¶ 77 (representing that "infiltration of the DTO by a confidential source or undercover agent would be highly unlikely" because DTO's inner circle was comprised of close associates of Fajardo Campos); ¶ 91 (explaining that "corruption of foreign officials makes asking for assistance [in conducting physical surveillance] dangerous to both the operational security of the investigation and to the physical safety of U.S. agents stationed in foreign countries"); ¶ 125 (opining that "[e]ven if search warrants were executed, it is unlikely that they would reveal the full scope of the organization").

Thus, this Court cannot find that the Arizona federal court abused its discretion in determining that Title III's necessity requirement was satisfied for each of the initial applications and extensions. *See Suggs*, 531 F. Supp. 2d at 18–19.

### B. The Arizona Court Had "Listening Post" Jurisdiction To Authorize The Interception Of Defendant's Electronic Communications

Fajardo Campos's contention that the Arizona federal court lacked jurisdiction to authorize the Title III wiretaps is likewise unavailing. As noted above, Title III defines an "intercept" as the "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or

13

other device." 18 U.S.C. § 2510(4). "[S]ince the definition of interception includes the 'aural' acquisition of the contents of the communication," *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992), all other circuits that have considered the issue (including the D.C. Circuit) have recognized that a Title III interception of an oral communication can take place in either of two locations: the location of the tapped phone, on the one hand, and "the place where the redirected contents are first heard[,]" on the other, *United States v. Cano-Flores*, 796 F.3d 83, 86 (D.C. Cir. 2015) (internal quotation marks and citation omitted). This latter location is referred to as the "listening post," and under this theory, courts have long held that a district judge has territorial jurisdiction to authorize a Title III wiretap so long as the location that the government sets up to listen to the recordings of the tapped calls is within the judicial district where the authorizing judge sits. *See, e.g.*, *id.* at 86–87 (collecting cases).

While the application of the listening post theory to *electronic* (i.e., text or email) communications, as opposed to telephonic (i.e., wire) communications, appears to be a matter of first impression in this district and elsewhere, this Court can find no principled basis for distinguishing electronic communications from wire communications in this respect. The statutory definition of "intercept" includes "aural *or other acquisition* of the contents" of communications. 18 U.S.C. § 2510(4) (emphasis added). And in this Court's view, the reading of Fajardo Campos's Blackberry messages qualifies as an "other acquisition" under the plain language of the statute. *See id.* Given the logic of *Rodriguez* and *Cano-Flores*, that "other acquisition" occurred in Tucson, when law enforcement officers first read Fajardo Campos's redirected communications. *See, e.g.*, *United States v. Henley*, 766 F.3d 893, 911 (8th

Cir. 2014) (agreeing with all other circuits that "'aural' acquisition necessarily encompasses the place where the redirected contents of the communication are first heard" (citation omitted)). Thus, this Court concludes that the Arizona federal court had territorial jurisdiction to issue the orders authorizing the interception.[6]

### C. The Wiretap Order Is Sufficiently Specific To Satisfy The Fourth Amendment

Perhaps recognizing that the suppression remedy that she seeks is not available under Title III, Fajardo Campos pivots in her reply brief and argues that the government's interception of her electronic communications violated her constitutional rights because the affidavits supporting the applications "do not satisfy the Fourth Amendment's requirement of particularity as to time, place, and nature of the interceptions." (Def.'s Reply at 14.) While she is correct that the Supreme Court has recognized that "'[t]he need for particularity and evidence of reliability in the showing

---

[6] The government seems to argue that even if the federal court in Arizona lacked territorial jurisdiction to issue the wiretap orders, Title III does not allow for suppression of electronic communications. (*See* Gov't Opp'n at 17–21.) It is not clear to this Court that Title III's statutory limitations on the suppression remedy in the context of electronic communications necessarily applies to such jurisdictional defects. Moreover, with respect to the government's suggestion that any territorial jurisdictional defect does not rise to the level of a constitutional violation that would independently warrant suppression (*see id.* at 21), there is disagreement amongst the courts as to whether suppression is warranted for lack of territorial jurisdiction with respect to Title III wiretap orders. *Compare United States v. Dahda*, 853 F.3d 1101, 1114–16 (10th Cir. 2017) (holding that suppression is not required when there is a jurisdictional defect, because Title III's jurisdictional requirement is not "one of 'those statutory requirements that directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device'" (quoting *United States v. Giordano*, 416 U.S. 505, 527 (1974))) *with Glover*, 736 F.3d at 509, 515 (D.C. Cir. 2013) (rejecting argument that suppression is inappropriate, and suppressing evidence obtained pursuant to a Title III warrant issued by a district court judge in the District of Columbia to place an audio recording device on a truck located in Maryland); *see also Dahda v. United States*, 138 S. Ct. 1491, 1498–1500 (2018) (agreeing with *Glover* that "core concerns" test does not apply to Title III orders that are insufficient on their face under § 2518(10)(a)(ii), but affirming the Tenth Circuit's holding because the language in the wiretap order authorizing interception outside Kansas was mere surplusage). This Court will not wade into this scantly mapped thicket of jurisdictional suppression issues now, both because it is unnecessary to do so given the Court's determination that the federal court in Arizona had jurisdiction, and because it has not been fully briefed and is not squarely presented in this case.

required when judicial authorization of a search is sought is especially great in the case of eavesdropping[,]'" (*id.* at 13 (quoting *Berger*, 388 U.S. at 56)), Fajardo Campos has failed to specify precisely *how* the government's affidavits lack specificity, and this Court's independent review of the applications and affidavits does not reveal any such flaws.

For example, the application dated April 24, 2013, identifies Fajardo Campos by name as one of the targets, and also provides details about the specific device of hers that would be the subject of surveillance. (*See* Apr. 2013 Appl. ¶¶ 2, 5.) The application further specifies "that there is probable cause to believe that [Fajardo Campos and others] have committed, are committing, and will continue to commit" certain delineated federal offenses (*id.* ¶ 4), and that specific information regarding those offenses would be obtained through interception of her electronic communications, including information about "the source of origin and supplier of the narcotics[,]" the identities of coconspirators, "the nature, extent and methods of operation" of the alleged drug trafficking organization, and "the receipt and distribution of contraband and money involved" in the alleged drug trafficking activities (*id.* ¶ 5; *see also* Apr. 2013 Aff. ¶ 5 (stating that there is probable cause to believe that "[t]he particular electronic communications of the TARGET SUBJECTS concerning the TARGET OFFENSES will be obtained through interception of the TARGET DEVICES")). In addition, the affidavit submitted in support of this same application lays out the means by which any communications that were not relevant to the investigation or otherwise criminal in nature would be "minimized" and not shared with other members of the team conducting the investigation. (Apr. 2013 Aff. ¶ 53.)

16

Each of the affidavits supporting each of the authorizations and extensions is substantially similar in this respect. (*See, e.g.*, Aug. 2015 Aff.) And this Court easily concludes that such information satisfies the Fourth Amendment's particularity requirement. *See, e.g.*, *Gaines*, 639 F.3d at 432–33.

## IV. CONCLUSION

This Court has reviewed the materials submitted to the Arizona federal court in connection with the government's requests to surveil the electronic communications of Defendant Fajardo Campos, and, for the reasons explained above, it has determined that the government's electronic surveillance of Defendant fully comports with both Title III and the Fourth Amendment. Accordingly, as stated in the accompanying Order, Fajardo Campos's motion to suppress the intercepted electronic communications will be **DENIED**.

DATE: December 10, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge