**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **CRIMINAL NO. 16-154 (KBJ)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LUZ IRENE FAJARDO CAMPOS,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States respectfully submits this Sentencing Memorandum in the case of defendant Luz Irene Fajardo Campos (hereafter the "defendant"), whose sentencing is currently scheduled for 2:30 p.m. on July 21, 2020. The defendant ran a sophisticated international drug trafficking organization, in which she sourced cocaine from Colombia, employed pilots, and brokered the purchase of planes to fly cocaine to Central America and Mexico. She also oversaw the importation of metric tons of precursor chemicals, some of which she processed into methamphetamine at a laboratory located in Mexico. On December 18, 2019, the defendant was convicted by a jury of conspiring to distribute five kilograms or more of cocaine and to manufacture and distribute 500 grams or more of methamphetamine knowing and intending that such substances would be unlawfully imported into the United States. ECF No. 108 (Verdict Form). The defendant has not accepted any responsibility and there are no mitigating circumstances in this case to justify a variance below the Guidelines range. *See* 18 U.S.C. § 3553(b)(1). Accordingly, the Court should impose the Guideline sentence—life imprisonment—to reflect the nature, circumstances and seriousness of the defendant's unlawful conduct.

I.   <u>Background</u>

    a.   <u>Procedural History</u>

On August 30, 2016, a grand jury returned a single-count Indictment charging the defendant with conspiracy to distribute five kilograms or more of cocaine, 500 grams or more of methamphetamine, and 1,000 kilograms or more of marijuana for importation into the United States in violation of Title 21, United States Code, Sections 959(a), 960, 963.  *See* ECF No. 1 (Indictment).  On December 20, 2018, the parties filed a joint motion to amend the Indictment, removing the marijuana distribution allegation and narrowing the time frame of the Indictment. ECF Nos. 59, 60; Minute Order, Jan. 16, 2019 (Granting Motion to Amend Indictment).  The Indictment also includes a forfeiture allegation pursuant to Title 21, United States Code, Section 853 and 970, which is applicable to Count One.[1]

The defendant was arrested in Bogotá, Colombia on March 31, 2017, and made her initial appearance in the District of Columbia on April 7, 2017.  The defendant stood trial beginning on December 10, 2019, and was convicted on December 18, 2019.

    b.   <u>The Offense Conduct</u>

Beginning at least in January 2010 and continuing through August 2016, the defendant led an international drug trafficking organization that was directly responsible for distributing and importing dangerous drugs into the United States.  Her organization was closely affiliated with the Sinaloa Cartel based in Mexico.  The Sinaloa Cartel is one of the largest, most prolific, and violent criminal organizations in the world.

---

[1] The government filed a motion requesting an order of forfeiture seeking an $18,000,000 forfeiture money judgment against the defendant.  *See* ECF No. 116.

Evidence at trial established the defendant directed much of her drug trafficking operations over her BlackBerry devices. The messages intercepted by the government from those devices established that she acquired and transported cocaine, obtained methamphetamine precursor chemicals, manufactured methamphetamine, negotiated drug transactions and bribed officials in Mexico. More specifically, the defendant purchased cocaine in Colombia and coordinate its transport via airplane into Central America and Mexico. She then coordinated its transport to the United States, where she could sell her cocaine for greater profit. In doing so, she acquired airplanes and hired pilots willing to make dangerous drug flights. Additionally, she acquired pilots and airplanes for the Sinaloa Cartel, for which she was also paid.

Testimony further established that she kept a dozen pilots on retainer to fly these drug loads on her behalf. Two such pilots, Esteban and his co-pilot, died near San Pedro Sula, Honduras in August 2013, while transporting 500 kilograms of the defendant's cocaine. She spoke frankly with her son and co-conspirator "Pak-Man" in the aftermath of the crash, stating: "Esteban died son, yesterday, we had lost him and today they found the plane." When asked by Pak-Man if the plane was bringing "work," the defendant replied, "Yes, 500 kg and he went past where he was going to land." *See* Gov't Trial Ex. 208a (Attached as Ex. 1). The defendant further instructed Pak-Man that they found the body and sent Pak-Man a photo of the plane wreckage. *See* Gov't Trial Ex. 290 (Attached as Ex. 2). Another pilot hired by the defendant, Rupert De Las Casas, testified that he crash landed a jet in the Venezuelan jungle in an attempt to pick up a load of cocaine. His testimony and corresponding documentary evidence established that the defendant coordinated this flight as well.

The defendant's operation was sophisticated and required extensive planning and coordination. She had to locate pilots qualified to fly particular airplanes, acquire planes capable

of flying between continents, receive access to clandestine airstrips, pay bribes to officials, and find cocaine suppliers.  She also needed workers to load, receive, smuggle and ultimately distribute the cocaine.  However, she did not deliver the cocaine herself or accompany any cocaine on a "black" flight over international waters.  Instead, the defendant put others' lives and liberty at risk. She stayed in relative safety behind her BlackBerry devices and protected by an armed bodyguard.

Finally, the defendant arranged to receive suitcases full of cocaine at Mexico City International Airport after they were smuggled aboard commercial flights leaving Bogotá, Colombia.  This system undeniably required coordination with a number of corrupt officials in Mexico and Colombia.  The defendant even solicited one witness to bribe an official at the airport to ensure the defendant's cocaine-filled suitcases were not seized by customs.  That same witness described at trial the number of kilograms per suitcase, the number of suitcases per flight, and the number of flights per week.  The witness was present at the Mexico City International Airport to receive one shipment of cocaine and described that the cocaine was loaded in a vehicle in front of the airport by individuals wearing, what appeared to be, official uniforms.  In total, the witness conservatively estimated that the defendant imported at least 1200 kilograms of cocaine by this method alone.

The defendant also conspired to import into Mexico ton quantities of monomethylamine, a precursor chemical for methamphetamine.  Gov't Trial Exs. 37 and 38 (Attached as Ex. 3). Moreover, she attempted to bribe custom officials to secure the release of monomethylamine barrels that had been seized by officials in the Mexican ports of Altamira and Manzanillo.  The defendant processed some of these chemicals into methamphetamine in a laboratory she operated with her adult sons in Sonora, Mexico.  During the operation of her methamphetamine

laboratory, her son "Activo" gave her updates over BlackBerry Messenger and sent a photograph of finished methamphetamine, to which the defendant replied "Alright!"  Gov't Trial Exs. 151a, 152 (Attached as Ex. 4).  Just like with the cocaine she distributed, she did not deliver the methamphetamine herself or personally combine chemicals to make methamphetamine.  She again put others at risk transporting her drugs and working in a methamphetamine lab, all while coordinating these deals over her BlackBerry devices.

The purpose of the defendant's drug trafficking organization was to make as much money as possible by producing, transporting and selling drugs.  The defendant knew she could profit the most by selling methamphetamine and cocaine in the United States, where she could demand a higher price than in Mexico.  The Drug Enforcement Administration ("DEA") seized approximately 24 pounds of the defendant's methamphetamine in the United States.  She attempted to sell 20 pounds of methamphetamine in Jackson, Mississippi for $180,000.  She also attempted to sell 4 pounds of methamphetamine in Tucson, Arizona for $30,000.  An average single dose of methamphetamine is approximately one-quarter of one gram.  That equates to more than 43,500 single doses of methamphetamine that the defendant would have distributed in communities across the United States, but for law enforcement intervention.

Drug plazas in Mexico are highly sought after territories controlled by various drug cartels.  The defendant moved her drugs under the protection of the Sinaloa Cartel, with which the defendant was closely affiliated.  In 2012, the Sinaloa Cartel was engaged in a conflict with a rival drug trafficking organization over the Mexican state of Morelos.  The defendant solicited a witness to bribe corrupt governmental officials in an attempt to have rivals of the Sinaloa Cartel arrested in Morelos.  Further, the defendant contacted the witness in an attempt to have Sinaloa Cartel members released from custody and to release equipment seized by law enforcement.

The defendant also inquired of the witness if he could provide rifles to her to support the Sinaloa Cartel's battle for drug trafficking routes in Morelos.

In total, the evidence at trial established that the defendant bribed officials, purchased chemicals, coordinated the distribution of ton quantities of cocaine and distributed dozens of pounds of methamphetamine for importation to the United States.

II.   Objections to the Presentence Investigation Report

On April 9, 2020, the Probation Office issued a Presentence Investigation Report ("PSR") for the defendant.  The PSR concluded that the defendant's overall Guidelines range in this case is imprisonment for life.  PSR ¶ 60 (Level 43, Criminal History I).  The Probation Office determined the defendant's Base Offense Level is 38, based on an offense involving 90,000 kilograms or more of converted drug weight pursuant to U.S.S.G. §§ 2D1.1(5) and (c)(1).  PSR ¶ 15.  Additionally, the Probation Office assessed the following enhancements: two level increase because the defendant unlawfully imported or exported a controlled substance under circumstances in which an aircraft other than a regularly scheduled commercial air carrier was used pursuant to U.S.S.G. § 2D1.1(b)(3);[2] and a three level increase because the defendant was a manager or supervisor of a criminal activity involving five or more participants pursuant to U.S.S.G. § 3B1.1(b).  PSR ¶ 18.

While a Guidelines range of Level 43 recommends life imprisonment, the government asserts that the following additional enhancements apply to the defendant's unlawful conduct: (a) a four level increase for defendant's organizer-leader role; (b) a two level increase for possession

---

[2] The government notes that the defendant would also be eligible for a two level increase because the offense involved the importation of methamphetamine and another two level increase for her direct involvement in the importation of a controlled substance.  U.S.S.G. §§ 2D1.1(b)(5) and (b)(16)(C).  However, the Guidelines are clear that the Court should only apply one of the enhancements for importation.  U.S.S.G. § 2D1.1, cmt. n.12 and cmt. n.20(B).

of a dangerous weapon; (c) a two level increase for bribery of a law enforcement officer; and (d) a two level increase for maintaining a drug premises.

       a.   <u>Organizer-Leader</u>

The Court should assess a four level increase pursuant to U.S.S.G. § 3B1.1(a) because the defendant was an organizer-leader of a criminal activity that involved five or more participants and was extensive.  According to the evidence at trial and as noted in the PSR, the defendant was the head of a drug trafficking organization aligned with the Sinaloa Cartel.  PSR ¶¶ 5, 18.  Application Note four to § 3B1.1 identifies the following factors the Court should consider in distinguishing leadership from mere management: exercise of decision making authority, nature of participation, recruitment of accomplices, claimed right to a larger share of the fruits of the crime, degree of participation in planning or organizing the offense, nature and scope of illegal activity, and the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1, cmt. n.4.  The defendant organized cocaine flights across continents, kept up to twelve pilots on retainer to fly drug loads, acquired jets to carry cocaine, set up a methamphetamine lab, recruited "chemists" to make the methamphetamine, imported precursor chemicals, bribed corrupt officials, had an armed bodyguard and directly imported cocaine and methamphetamine into the United States.  Accordingly, the government objects to only a three level increase because the manager or supervisor enhancement does not accurately reflect the large scope of the defendant's leadership role within her organization.

       b.   <u>Possession of a Dangerous Weapon</u>

The Court should assess a two level increase for possession of a dangerous weapon because a firearm was possessed in furtherance of the defendant's drug trafficking activities.  U.S.S.G. § 2D1.1(b)(1).  The evidence established that the defendant had a personal bodyguard

who was armed with a pistol and accompanied the defendant to meetings to negotiate drug transactions.  Notably, this enhancement applies even if the defendant did not personally possess the weapon.  The plain language of this offense characteristic states the enhancement applies "if a dangerous weapon *was possessed*."  *Id.* (emphasis added).  Whereas other enhancements require that the defendant specifically engaged in the conduct; for example "if the *defendant used* violence. . . increase by 2 level."  U.S.S.G. § 2D1.1(b)(2) (emphasis added).  "Once constructive possession of a weapon during a drug offense has been shown, Application Note 11 of the Guidelines instructs that 'the enhancement should be applied … unless it is clearly improbable that the weapon was connected with the offense.'"  *United States v. Bagcho*, 923 F.3d 1131, 1138 (D.C. Cir. 2019) (internal citations omitted).  "There must be something more than mere presence at the scene of a criminal transaction.  There must be some action, some word, or some conduct that links the individual to the [contraband]."  *Id.*

The defendant's purpose for employing an armed bodyguard was plainly for her safety and protection while meeting with other drug traffickers to negotiate and coordinate drug transactions.  This enhancement reflects the increased danger and potential for violence when drug traffickers possess weapons.  U.S.S.G. § 2D1.1, cmt. n.11.  A two level increase for firearm possession is warranted.

       c.  Bribery

While the PSR affirmatively recognizes that the defendant committed acts of bribery, the PSR does not include a two level increase for bribery or attempted bribery of a law enforcement officer to facilitate the commission of the offense.  PSR ¶¶ 6, 9, 16; U.S.S.G. § 2D1.1(b)(11).  Evidence at trial established that the defendant attempted to bribe customs officials at shipping ports in Mexico to obtain methamphetamine precursor chemicals, that she bribed law

enforcement officials in Colombia and Mexico to receive cocaine at Mexico City International Airport, and that she attempted to bribe other law enforcement officers to secure the release of imprisoned allies and the arrest of rival drug traffickers. This type of bribery is a clear indication of the sophistication of the defendant's criminal actions and increased the probability of successful trafficking. A two level increase is warranted for bribery.

        d.  <u>Maintaining a Drug Premises</u>

Last, the Court should assess a two level increase because the defendant maintained a methamphetamine laboratory in the desert outside of Hermosillo, Sonora, Mexico for the purpose of manufacturing and distributing methamphetamine. U.S.S.G. § 2D1.1(b)(12). While the government does not have a specific address for the lab, that is not required. Clandestine drug labs, such as the one the defendant operated, often do not have a registered address and are located in hidden or remote areas to avoid detection. The purpose of the defendant's laboratory was to manufacture methamphetamine, which she did by recruiting "chemists" and putting her adult sons in charge of running the day to day operations at the lab. A two level increase is warranted for maintaining a drug premises.

Accordingly, the government asserts that the Total Offense Level under the Guidelines should be Level 50. The corresponding Guidelines' range is still life imprisonment.

  III.  <u>Sentencing Factors Pursuant to Title 18, United States Code, Section 3553(a)</u>

The Sentencing Guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in *Booker* that sentencing courts must consider the Guidelines in formulating an appropriate sentence. *Id.* In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of *Booker*:

> [A] district court should begin all sentencing proceedings by
> correctly calculating the applicable Guidelines range. As a matter of
> administration and to secure nationwide consistency, the Guidelines
> should be the starting point and the initial benchmark.

*Gall*, 552 U.S. at 49 (citation omitted).  Next, a district court should "consider all of the §

3553(a) factors to determine whether they support the sentence requested by a party.  In so

doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district

court] must make an individualized assessment based on the facts presented." *Id.* at 49-50

(citation and footnote omitted).

In determining the appropriate sentence, the statute directs courts to consider the nature

and circumstances of the offense and the history and characteristics of the defendant.  18 U.S.C.

§ 3553(a)(1).  Further, courts are also directed to "impose a sentence sufficient, but not greater

than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect
>         for the law, and  to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant;
>         and
>
> (D)     to provide the defendant with needed educational or
>         vocational training,  medical care, or other correctional
>         treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines

range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines

supports the premise that district courts must begin their analysis with the Guidelines and

remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.   The

relevance of the Guidelines throughout the sentencing process stems in part from the fact that,

while advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

      a.  Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense

The defendant committed a serious crime against the United States, having been convicted of conspiring to distribute large quantities of cocaine and methamphetamine into the United States. Her organization was expansive and well coordinated. She utilized sophisticated aircraft, maritime vessels, ground transportation and a system of couriers spanning over two continents. To that end, the defendant bribed officials in Mexico and elsewhere so she and her co-conspirators could act with impunity. She enlisted the help of numerous individuals who worked at her direction, including her own children that she placed in charge of her methamphetamine laboratory. She also coordinated the transportation and distribution of cocaine with her children and coordinated directly with cocaine suppliers in Colombia. In an intercepted BlackBerry conversation, she even instructed one cocaine producer to make her own brand of cocaine by stamping her nickname, "JENCA," into the bricks.

Perhaps the most alarming aspect of the defendant's unlawful activities is that she put others at grave risk to accomplish her objectives. She solicited Mario Grado Field—an otherwise law-abiding, longtime resident in the United States—to deliver methamphetamine in

Tucson, Arizona, for which he was arrested.  She coordinated the transport of 20 pounds of

methamphetamine to Jackson, Mississippi with a courier, Jorge David Ramirez Biebrich, who

was arrested in Mississippi and received a lengthy jail sentence.  Clearly, the defendant did not

care about whom she hurt so long as she could make a profit trafficking drugs.  She continually

put pilots and others at risk to move her cocaine.  According to the testimony of Rupert De Las

Casas, drug flights often do not have a flight plan, they fly without lights or an activated

transponder, and they land on makeshift jungle runways in pitch-black conditions.  These were

necessary risks for the defendant to take in order to move her drugs to maximize her profits

while minimizing the possibility that her cocaine loads would be interdicted by law enforcement.

But these risks have grave consequences to individuals involved, and the defendant's unlawful

activities have caused the deaths of at least two pilots who were flying her cocaine.

As the Court is well aware, cocaine and methamphetamine are extremely dangerous and

destructive substances.  Cocaine abuse has devastated communities in the United States, Mexico,

Colombia, and elsewhere, ruining lives, splitting families apart, inflicting violence on innocent

by-standers, and wreaking havoc on society at large.  It is also a very destabilizing and corruptive

force in countries throughout the region that do not have strong enough law enforcement

institutions to combat it, such as Mexico, further adding to the destructive nature of the crime.

Methamphetamine is just as destructive.  It is often produced in laboratories in Mexico like the

defendant's lab.  It can be made cheaply in Mexico and sold for extremely high profit margins

once illegally imported into the United States as evidenced by the price the defendant expected

for 24 pounds of methamphetamine – $210,000.  However, like cocaine, methamphetamine

devastates communities in the United States and wreaks havoc on individuals and families.  The

social costs of methamphetamine and cocaine distribution are enormous.  The defendant's

unlawful conduct played a significant role in perpetuating drug abuse and addiction in the United States and its corrosive effects on communities in multiple countries.

Ultimately, the defendant's goal was to make as much money as possible by distributing drugs.  The defendant acted without concern for the individuals suffering from addiction or the associated harms of drug abuse.  Accordingly, the Court should impose a life sentence to reflect the nature and seriousness of the crimes committed by the defendant.

      b.  <u>History and Characteristics of the Defendant</u>

The government agrees with the PSR regarding the defendant's history and characteristics.

      c.  <u>Adequate Deterrence</u>

Given the adverse impact that drug trafficking has on society and the serious detrimental effects of cocaine and methamphetamine in communities, it is important that the Court impose a sentence that deters others from undermining the rule of law.  While this prosecution has incapacitated some of the narcotics trafficking in Central and South America, importation of controlled substances from those regions into the United States still occurs in large quantities. The recommended sentence provides critical general deterrence to other narcotics trafficking leaders that their participation in narcotics importation into the United States will result in substantial prison sentences.

      d.  <u>Protect the Public from Further Crimes of the Defendant</u>

Prior to her arrest, the defendant led a drug trafficking organization for many years with significant ties to the Sinaloa Cartel.  After serving any prison sentence imposed by this Court, the defendant will almost certainly be deported to Mexico, where the defendant is a citizen and has substantial familial ties.  She will at that point be in a physical location where she could

conceivably return to the same criminal conduct, where she maintained significant influence over corrupt public officials and has strong ties to active members of the Sinaloa Cartel.  Only a life sentence, as recommended by the Guidelines, will be sufficient to protect the public from the defendant returning to criminal activity.

  e. <u>Need for Sentence Imposed to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants</u>

Section 3553(a)(6) articulates "the need to avoid *unwarranted sentence* disparities among defendants with similar records who have been found guilty of *similar conduct*."  18 U.S.C. § 3553(a)(6) (emphasis added).  When determining whether a sentence creates an unwarranted disparity, the Court should consider a defendant's acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, a defendant's criminal history and whether and to what extent a defendant cooperated.  *See, e.g.*, *United States v. Mejia*, 597 F. 3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's "harsher" sentence was not unwarranted).  A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [her] case, not to a particular result."  *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

As set forth above, the defendant engaged in drug trafficking activities and conspired to distribute ton quantities of cocaine and dozens of pounds of methamphetamine into the United States.  In arriving at its sentencing recommendation, the government has evaluated the defendant's role within the conspiracy and the length and extent of her criminal conduct.

Other international narcotics traffickers, who had similar criminal culpability and who did not provide assistance to the government, have received sentences similar to the sentence recommended by the government.  For example in the case of *United States v. Thompson, et al.*,

14

defendant Oral George Thompson was sentenced to 286 months and defendant Dwight Knowles was sentenced to 240 months after being convicted at trial.  Both defendants were convicted of conspiracy to distribute cocaine on board a U.S. registered aircraft from Colombia to Central America under Title 21, Section 959(b).  *United States v. Thompson, et al.*, 12-CR-266 (D.D.C.). However, neither Thompson nor Knowles were successful in their endeavors, nor were their drug trafficking activities as extensive in time or scope as the defendant's.

Recently, in the Southern District of Florida, Sergio Neftali Mejia Duarte was sentenced to life in prison after being convicted of conspiring to distribute cocaine in violation of Title 21, Section 959(a).  Mejia Duarte led a Honduras and Guatemala-based drug trafficking organization that was part of the cocaine distribution supply chain from Colombia to the United States.  Much of the cocaine transported by Mejia Duarte was supplied to the Sinaloa Cartel, the same organization with which the defendant was closely aligned.  *United States v. Mejia Duarte*, 15-CR-20540 (S.D.F.L.).

Last, one of the defendant's co-conspirators, Jorge David Ramirez Biebrich, was sentenced in Mississippi state court to 20 years imprisonment with 10 years suspended.  *See* Ex. 5 (Judgement of Conviction and Sentence Order).[3]  Notably, Mr. Ramirez was a low-level drug courier working for the defendant to transport and sell 20 pounds of her methamphetamine in the United States.  Whereas, the defendant was the leader of her drug trafficking organization who had her own methamphetamine lab in addition to trafficking ton quantities of cocaine.

---

[3] The date of birth listed for Mr. Ramirez in the Judgement of Conviction and Sentence Order appears to be inaccurate.  The government confirmed Mr. Ramirez's date of birth with the Rankin, MS Country Sheriff's Office and the City of Pearl, MS Police Department.  Mr. Ramirez's social security number is correctly listed in the unredacted Order.

IV.    <u>Conclusion</u>

For the reasons set forth above, the government respectfully requests that the Court impose a Guideline range sentence of life imprisonment which is reasonable, appropriate and matches the severity of the crimes committed by the defendant.  A life sentence is sufficient, but not greater than necessary, to hold the defendant accountable for her crimes, promote respect for the law, deter the defendant and others from committing similar serious crimes and protect the public.

Respectfully Submitted,
MARLON COBAR
Acting Chief
Narcotic and Dangerous Drug Section
U.S. Department of Justice

By:    /s/
Cole Radovich
Kaitlin Sahni
Anthony Aminoff
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division, U.S. Department of Justice
Washington, D.C.  20530
Telephone: (202) 514-0917

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing

(ECF) system with the United States District Court for the District of Columbia to counsel of

record for the defendant, this 30th day of June, 2020.

By:     /s/  *Cole Radovich*
        Cole Radovich
        Trial Attorney
        Narcotic and Dangerous Drug Section
        Criminal Division
        U.S. Department of Justice