| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF COLUMBIA |
| 2 | _____ |
| 3 | United States of America,    ) Criminal Action |
| | ) No. 1:16-cr-00154-KBJ |
| 4 | Plaintiff,    ) |
| | ) **Initial Pretrial** |
| 5 | vs.    ) **Conference** |
| | ) |
| 6 | Luz Irene Fajardo Campos,    ) Washington, D.C. |
| | ) November 22, 2019 |
| 7 | Defendant.    ) Time:  10:30 a.m. |
| 8 | _____ |

Transcript of **Initial Pretrial Conference**
Held Before
The Honorable Ketanji Brown Jackson
United States District Judge

_____

A P P E A R A N C E S

For the Plaintiff:      **Cole A. Radovich**
                        **Anthony T. Aminoff**
                        **Kaitlin J. Sahni**
                        U.S. DEPARTMENT OF JUSTICE
                        Narcotics and Dangerous Drug Section
                        145 N Street, Northeast
                        Second Floor, East Wing
                        Washington, D.C. 20530

For the Defendant:      **Robert A. Feitel**
                        LAW OFFICE OF ROBERT FEITEL
                        1300 Pennsylvania Avenue, Northwest
                        Washington, D.C. 20008

Also Present:           Teresa Salazar, Interpreter
                        Gladys Segal, Interpreter

_____

Official Stenographic Court Reporter:
                        Nancy J. Meyer
                        Official Court Reporter
                        Registered Diplomate Reporter
                        Certified Realtime Reporter
                        333 Constitution Avenue, Northwest
                        Washington, D.C. 20001
                        (202) 354-3118

<u>P R O C E E D I N G S</u>

1

2          (Oath administered to Gladys Segal, Interpreter.)

3          THE COURTROOM DEPUTY:  Please raise your right hand.

4          INTERPRETER SEGAL:  To the best of my ability, I do.

5          THE COURTROOM DEPUTY:  Thank you very much.

6     Your Honor, we're in Criminal Action 16-154, United

7     States v. Luz Irene Fajardo Campos.

8          If I could have counsel approach the podium and identify

9     yourself for the record, please.

10          MR. RADOVICH:  Good morning, Your Honor.  Cole

11     Radovich for the United States, and at counsel table is trial

12     attorney Anthony Aminoff and Kaitlin Sahni.

13          THE COURT:  Good morning to all of you.

14          MR. FEITEL:  Good morning, Your Honor.  Robert Feitel

15     for the defendant, who I'm pleased to report is actually

16     present in the jurisdiction for this morning's hearing, and

17     along with her is my full-time paralegal, Andres Suarez.  The

18     government knows Mr. Suarez.  They apparently like him better

19     than me.  They have no objection to him sitting at counsel

20     table, if the Court will grant him leave to do so.

21          THE COURT:  He has my permission.  Thank you.  Good

22     morning to all of you.

23          We are here for a pretrial conference to prepare for

24     Ms. Fajardo Campos's jury trial, which is a trial that is

25     scheduled to commence on December 10th, on a single criminal

1    count, which is conspiracy to manufacture and distribute

2    5 kilograms or more of cocaine, and 500 grams or more of

3    methamphetamine intending or knowing that these controlled

4    substances will be unlawfully imported into the United States,

5    in violation of Title 21 United States Code Sections 959(a),

6    960(b)(1)(B)(ii), 960(b)(1)(H), 960(b)(1)(G), and 963.

7        So I have several items on my agenda to discuss this

8    morning.  I'd like to go over my trial procedures, my jury

9    selection procedures, the trial schedule.  I'd like to review

10   in that context the parties' plans with respect to witnesses

11   and expert testimony.  I'd like to give you my rulings on three

12   pending motions:  the government's motion *in limine* as to other

13   crimes, which is ECF No. 48; the defendant's motion to suppress

14   emails, which is ECF No. 52; and the government's motion

15   *in limine* to use statements, which is ECF No. 68.

16       Now, I just want to say briefly before we get too far

17   that I'm also going to take a point of personal privilege with

18   respect to those motions.  I am prepared this morning to give

19   you the outcome, the answer.  I have reviewed them all.  I was

20   going to actually write on some of the issues, but certain

21   emergency motions have come in that have required my full

22   attention, and I'm not prepared to give you in writing or fully

23   orally the reasons behind my determinations, but when we get to

24   it, I will give you the answers so that you can prepare for

25   trial.  And, hopefully, at the final pretrial conference I will

1    have had a chance to lay them out so that you'll understand for

2    the record why I've ruled in the way that I have.

3         I also, in the context of today, would like to give you

4    a briefing schedule for the motion that came in, I think, just

5    yesterday or two days ago; defendant's motion *in limine* to

6    preclude introduction of defendant's recorded jail phone call,

7    which is ECF No. 90.

8         Mr. Radovich, do you intend to respond to that in

9    writing, or would you prefer that we just address it at some

10   point, or you want to argue it, or what do you want to do?

11        MR. RADOVICH:  Your Honor, if -- if the Court would

12   allow, we'll respond in writing, and we should file it this --

13   we'll file this afternoon.

14        THE COURT:  Oh, okay.  All right.  Good.  So we'll

15   get that in.

16        And then, you know, I'll just talk to you a little bit

17   about some of the disputes laid out in the joint pretrial

18   statement and how I ordinarily resolve them.

19        All right.  So beginning with the trial logistics,

20   schedule, and jury -- and I'll try to keep my voice up.  What I

21   think is happening is that this microphone is cutting in and

22   out, perhaps because of the interface with the translation

23   system.  Something we may need to have looked into obviously

24   before trial.

25        Mr. Feitel, I usually talk to defense counsel in

1    criminal cases upfront about logistics concerning your client's

2    appearance.  I'm sure you will have taken care of everything in

3    terms of her dress and that sort of thing.

4         You're welcome to stay seated and talk, if you can, on

5    that microphone or you can come forward, whatever is easiest.

6         MR. FEITEL:  It's so engrained.  Your Honor may know,

7    there are some courthouses where attorneys don't stand when

8    they speak to the Court.

9         THE COURT:  Oh.

10        MR. FEITEL:  It's -- yeah, it's -- I just always

11   stand up.  Even though they say sit down.

12        THE COURT:  That's fine.

13        MR. FEITEL:  I'll try to be brief.  I -- I had

14   considered -- I understand I have a -- you know, a template

15   motion for my client to wear civilian clothes during the trial.

16   I've actually spoke with her about that.  Although I did tell

17   the prosecutors and I will tell Your Honor, I am considering

18   for the first time not filing such a motion, leaving my client

19   dressed in a prison jumpsuit.  There may be some, I think,

20   tactical reasons for doing it in this case, but either way, if

21   I'm going to file a motion, it will be far enough in advance of

22   the trial for it to be granted and for the marshals to be

23   prepared.  And I've talked to somebody about getting clothes

24   for her.  We actually spoke to Ms. Fajardo about it.

25        THE COURT:  All right.  Well, my ordinary practice --

1   and I don't -- can't speak for my colleagues -- is that in

2   criminal cases defendants do wear civilian clothes, and they

3   usually do so not even by motion.  But maybe this is a unique

4   case.  I don't know.

5           Mr. Radovich, have you had some experience with this in

6   terms of your practices or the government's practices with

7   respect to the dress of the defendant?

8           MR. RADOVICH:  Your Honor, in my experience, the

9   defendant has always dressed in civilian clothes.  I guess the

10  government would object to the defendant not being in civilian

11  clothes, unless it goes to a specific defense or -- there's

12  some purpose other than to gather sympathy from the jury.

13          THE COURT:  Okay.

14          THE INTERPRETER:  With permission of the Court, the

15  interpreter is having difficulty hearing counsel at the

16  lectern.  Not the judge, but, yes, counsel at the lectern.

17          THE COURT:  Well, one thing I was just going to

18  suggest:  I think we have lapel mikes, which might be helpful

19  for the lawyers; that way you can stay where you are.  You can

20  stand up, if you want, Mr. Feitel, but at least you'll be miked

21  when you do so.

22          THE COURTROOM DEPUTY:  Judge, can I take a moment to

23  take the system down and come back up?

24          THE COURT:  Yes.

25          (Off the record.)

1          THE COURT:  You'll have to manage your own miking.

2     If you're having side conferences, you'll need to turn it off;

3     otherwise, you'll be heard.

4          Okay.  So, Mr. Feitel, maybe it sounds like your motion

5     will have to be the opposite, which is the motion to allow

6     my [sic] client to remain in her prison uniform, and then the

7     government will have its opportunity to object, if that's what

8     you intend to do.

9          MR. FEITEL:  If -- can everyone hear me?

10          THE COURT:  Yes.

11          MR. FEITEL:  Okay.  I will consider the choices,

12     speak to my client about it, and I'll file a motion.  I'll

13     speak to the government about it as well.  I would note that I

14     deem it somewhat ironic that the government had said to me that

15     if I won't stipulate as to the jail calls' authenticity they'd

16     be forced to call someone from the jail, Department of

17     Corrections, to authenticate the call, which would certainly,

18     you know, I think, told the jury that she's incarcerated; but

19     I'll just leave it to -- to consideration between now and, you

20     know, next week.

21          THE COURT:  All right.  Well, I just -- let me just

22     say that I think the background assumption will be that she

23     will be in civilian clothes, and if your decision is something

24     else, then we can discuss it; all right?

25          We also need to talk about the waiver of her right to be

1    present at the bench conferences.  Assuming we can get this

2    technology working so that she can consistently hear through

3    the -- through the earphones, it is the Court's practice to not

4    have criminal defendants come when we have conferences.  And so

5    I think under these circumstances it may well require your

6    waiver.  And perhaps you could talk with her about that as well

7    and make your representations at the final conference; all

8    right?

9               MR. FEITEL:  I will do that.  I think there is case

10   law in this jurisdiction that say that if the defendant can

11   hear the goings-on, their right to participate is -- is

12   preserved, but I'll speak to Ms. Fajardo about that.

13              THE COURT:  I intend to impanel 14 jurors, which is

14   my standard in the criminal context, 12 deliberating and

15   2 alternates.  For a case of this nature -- well, we ordinarily

16   request about 50 venire persons to yield this number.  But I am

17   considering whether to call more in a case of this nature just

18   because we want to make sure that everyone can intelligently

19   exercise their strikes, if necessary, and we may have -- I

20   don't know that we would, but we may have more strikes for

21   cause than we otherwise would given the -- the charges in this

22   case.

23              So because of the need for translation, I think we are

24   likely to use a method that is different than what I ordinarily

25   do.  I think it's going to be too hard to have a lot of husher

1    noise and Ms. Fajardo Campos trying to listen through the

2    earphones to both what's happening at the bench and the

3    translation.  So I have contemplated working with the courtroom

4    deputies to use another courtroom to hold the corpus of the

5    people while we're going through most of our *voir dire*.

6          So let me explain.  I use a version of the struck

7    method.  I'm going to issue a trial procedures order that's

8    pretty detailed that explains to you exactly all of my trial

9    procedures.  This is just a preview of what you're likely to

10   see.  We bring in everyone, and the courtroom deputy sits them

11   in the courtroom on that side of the courtroom in rows.  You'll

12   have your jury list, and I think she seats eight across each of

13   the rows, continuing to go back.  So you have to keep track of

14   where everybody is sitting from the wall in.  So number 1 sits

15   closest to the wall.  Eight over.  Number 9 sits closest to the

16   wall, et cetera, on this side of the courtroom.  Yes, running

17   this way.  And so you'll keep track on your list based on that

18   rubric of who is who as we go along.

19         At the beginning -- she'll start sitting them that way

20   from the beginning.  I give my introductions, this is what this

21   case is about, generally.  And ask the series of *voir dire*

22   questions to everyone.  Everyone has a note card.  Everyone

23   listens, and we have fashioned the questions so that

24   affirmative answers are to be indicated on the card.  So, for

25   example:  Are you or any one of your friends or family members

1    in law enforcement?  If the answer is yes, please write the

2    number 1 on your card.  And they designate each number, and we

3    go through all the numbers.

4         Then the cards are collected.  Ordinarily they'd be

5    brought to the bench.  The parties would come to the bench, and

6    we'd call each person up one at a time.  Because of the

7    logistics that are necessary for this case, I believe we're

8    going to, once all the people have answered, collect the cards.

9    They will remain in order, have the entire group go to another

10   courtroom, and then, essentially, through the workings of our

11   court, we will have each person -- instead of coming up to the

12   bench with the husher, we'll have Ms. Fajardo Campos, the

13   interpreter, and the lawyers here have the particular person

14   come and sit in the witness box, and I will follow up with them

15   on the cards the way we would normally do at the bench, and

16   you-all are permitted to ask limited follow-up questions.

17        When they depart, they will then depart and then go back

18   to the sort of initial courtroom -- or the other courtroom.

19   When they depart, any charges that you have for cause we'll

20   discuss immediately.  And then if they're stricken, you'll know

21   at that point, but it'll be up to you to keep track of the

22   strikes.  And it's a little harder than my typical scenario

23   because they're not returning so that you can see them.

24   They're going to a different place.  So you have to keep track

25   of who's been stricken.  We'll go through the whole process

1    qualifying, as I said, approximately 50, maybe a little bit

2    more, and then we bring them all back.  And they're seated in

3    the way they were at the very beginning.  Your notes will

4    indicate who has been stricken, and you'll exercise your

5    peremptories.

6           The defense has ten peremptory challenges.  The

7    government has six.  They're executed through simultaneous

8    exchanges in alternating rounds, which is a very technical way

9    to say this:  So in Round 1, the defendant will select two, the

10   government will select one.  You're doing this at the same

11   time.  You then switch your lists so that you see the two,

12   Mr. Radovich.  You see the one.  Everyone knows.  And then we

13   continue to do that, two, one, in the next round.

14          So Round 2 is two, one.  Rounds 3 and 4 are two, one;

15   and then Rounds 5 and 6 are one, one until we get to all of the

16   exercises of the strikes.

17          You may ask a question, yes.

18          MR. AMINOFF:  Thank you, Your Honor.  How many jurors

19   are -- potential jurors are considered in each round?  I'm not

20   sure how -- so the defense has two, we have one, and --

21          THE COURT:  It's the whole pool of qualified people.

22   So --

23          MR. AMINOFF:  I see.

24          THE COURT:  You are -- there are going to be 50

25   people who we've talked to at this point, and there are

1   undoubtedly going to be a handful that you really, really want

2   gone.  And so it doesn't matter, I think, where you're pulling

3   them from at that point.  You just decide in your whole list of

4   50 people, "Here are my -- here's my one strike in Round 1,"

5   and the defense says, "Here are my two strikes in Round 1," and

6   wherever they are, you strike them off and keep going.

7            MR. AMINOFF:  Understood.  Okay.  Thank you.

8            THE COURT:  Does that make sense, Mr. Radovich?

9   Maybe not.

10           MR. RADOVICH:  It does, Your Honor.

11           THE COURT:  Okay.

12           MR. RADOVICH:  Can you hear me?

13           THE COURT:  Yes.

14           MR. RADOVICH:  It's really loud now.

15       So what jurors are actually going to seated in the box

16   once we get -- have 50 qualified?

17           THE COURT:  So we have found that it has been, sort

18   of, difficult and time-consuming to have people in and out of

19   the box.  So that's why we do the peremptories in this way.

20   The jurors aren't going to know any difference.  They're

21   sitting out there.  You guys are silently exchanging your

22   lists, explaining who's being stricken in the whole pool, and

23   then once we get down to Round 6, where you each just have one

24   more pick and you exchange, then the first 14 people that

25   remain are the ones who are seated in the box.

```
1        Then we have one round of alternate strikes.  And this
2    is how that -- so there are 14 people.  And what we -- what we
3    will do today right now is identify the two seats that are
4    going to be alternate seats, and we'll do it in a second.  I'll
5    give each one of you just -- you can pick a number.  So when
6    those 14 people are up there, when we're looking at them, we
7    know Seat No. 3 and Seat No. 9, for example, are the
8    alternates.  After they're there and you see everybody, then
9    you'll have a chance, each of you, to have one strike for the
10    alternates.  Those strikes can be used to strike three -- you
11    know, one of you can pick 3, one of you can pick 9, or, you
12    know, out in the audience that there are two -- the next two
13    people; right?  You would prefer to have one -- you know, you
14    don't want that next person.  So if Mr. Feitel strikes 9,
15    you're like, "This is a disaster.  I don't want the next
16    person."  So you can use your one strike to strike the guy from
17    the audience who was Person No. 15.
18        Do you understand what I'm saying.
19            MR. RADOVICH:  I do, Your Honor.
20            THE COURT:  All right.  So, Mr. Radovich, do you have
21    an alternate number?
22            MR. RADOVICH:  Six.
23            THE COURT:  Alternate No. 1 will be in Seat 6.
24        Mr. Feitel.
25            MR. FEITEL:  I want my client to participate in the
```

1    process.

2              THE COURT:  Please.

3              MR. FEITEL:  Number 13.

4              THE COURT:  Number 13.

5              MR. FEITEL:  No.

6              THE COURT:  No?

7              MR. FEITEL:  Yes, ma'am.  I'm going to learn to turn

8    off this microphone.

9              THE COURT:  Okay.  So the alternate seats are 6 and

10   13.  Okay.  It's a complicated process, but I think we all

11   understand.

12        Now, in terms of the actual trial, then we will proceed

13   to trial.  Mr. Radovich, for the government's case, how many

14   days are you anticipating?  What is our reasonable estimate

15   given where we are?

16             MR. RADOVICH:  Your Honor, if we -- if we start jury

17   selection and we get the jury impaneled on the 10th, we'll be

18   ready with the first few witnesses that day, but we're

19   anticipating going the 11th, the 12th, the 13th, which is the

20   Friday of that first week, the 16th and the 17th at a minimum,

21   potentially into the 18th.  And it also depends on if -- if the

22   defendant calls any witnesses, because then that would

23   increase -- that's assuming no defense case.

24             THE COURT:  Right.  Okay.  All right.  So it is what

25   it is.  I mean, I do think that given this process that we are

1    anticipating, it will probably take all day on the 10th to get

2    our jury selected.  You should prepare your opening statements,

3    but I think it's probably unlikely that we'll get that far,

4    just because of the nature of having to do what it is that we

5    have discussed.

6         All right.  But speaking of openings, do you have a

7    sense of how much time you might need?

8         MR. RADOVICH:  We do, Your Honor.  About 20 minutes

9    for the government.

10        THE COURT:  Okay.  And, Mr. Feitel, you might maybe

11   wait or decide now whether you want to do openings first or you

12   want to wait until later.

13        MR. FEITEL:  Your Honor, after the jurors are bored

14   to tears by the government's loquacious 20-minute statements,

15   I'll try to be a brief 15 minutes.

16        THE COURT:  All right.  I will -- I won't hold you to

17   it, but --

18        MR. FEITEL:  Well, I promised Your Honor's court

19   reporter that even though I was born in New York from a very

20   fast-talking family, that I would try to moderate the tone, but

21   I do think 15 minutes -- speaking out loud for 15 minutes is a

22   lot longer in reality than people think it is in theory in

23   their heads.  So I think brevity, as they say, is the soul.  It

24   will be the soul of this great case.

25        THE COURT:  All right.  So in terms -- we will start

1    each trial day at 9:30 a.m. and go to 4:30 p.m.  There may be

2    times in which I might have to carve out some time, maybe

3    30 minutes in the morning or whatever, but I'll let you know.

4    So you should plan on that, and it's helpful if counsel are

5    here about 15 minutes early if there are preliminary matters

6    that we need to address before the jury comes in.

7         I try to take a lunch break of an hour, during which we

8    may have to deal with various issues, such as instructions or

9    whatever, but I usually take a lunch break of an hour and a

10   morning and afternoon recess of about 15 or 20 minutes each.

11        You-all are familiar with the sort of standard

12   conventions about standing to object.  We're going to work on

13   the microphones because I hear them all cutting out, even the

14   counsels' microphones as well.  So we'll have that looked into.

15   You'll use the microphones.  We'll have objections, one or two

16   words.  Come to the bench if anything more is required.

17        I've looked at the government's exhibit list.  All of

18   your exhibits, are they all premarked, Mr. Radovich?

19             MR. RADOVICH:  They will be premarked, Your Honor,

20   yes.

21             THE COURT:  So we should premark everything.  Do

22   you -- what are your thoughts on showing them?  Are you an ELMO

23   person or --

24             MR. RADOVICH:  Your Honor, we have a trial software,

25   and we're doing to have a paralegal that's going to operate a

1    computer during the trial.

2              THE COURT:  Okay.

3              MR. RADOVICH:  It's going to pull up the exhibits.

4    There are some hard exhibits.  For example, the drugs or discs

5    that have files on them.

6              THE COURT:  Okay.

7              MR. RADOVICH:  We can approach the witness that way,

8    but for any of the paper exhibits, the -- we're also going to

9    have a binder at the witness stand so that they -- we don't

10   have to pull up everything on the screen.  The witness can flip

11   to --

12             THE COURT:  Great.

13             MR. RADOVICH:  -- the exhibits.

14             THE COURT:  All right.  Just so you know how our

15   system works, both of you -- and I'm sure you're familiar with

16   it, but I'll just remind you.  If something is shown on the

17   screen to a witness for the purpose of identification, the

18   system is such that the witness will be able to see that alone

19   and that it won't be until it is received into evidence and

20   then published that the jury will be able to see it.

21        The jury box is now equipped with screens.  The folks in

22   the back row, they're actually -- they lift them up, and

23   they're like tablets that they can lift up.  The ones in the

24   front row, they're on the other side of that wall.  So the jury

25   can see what is being displayed once it has been shown -- once

1    it has been admitted.  This has been a little tricky for some

2    lawyers.  I just had a trial in which the lawyers would put up

3    something for identification and forget that the jurors

4    couldn't see it and forget to move it into evidence.  And so

5    there was, like, a lot of discussion about this document.

6         And then at some point I would say, "Counsel, would you

7    like to have this document admitted?"  And they would say, "Oh,

8    yes."  And then they get permission to publish, and they would

9    literally have it on the screen for like five seconds because

10   they asked all the questions about it ahead of time.  And then

11   they would say, "Okay.  That's enough."  And so the jurors

12   actually didn't see the document.  So just keep that in mind in

13   terms of your presentation for the jurors.

14        Let's see.  Mr. Radovich, are you envisioning that these

15   documents are coming in sort of individually, or are there

16   going to be batches?  How --

17        MR. RADOVICH:  Well, Your Honor, I think both.  The

18   largest percentage of the evidence is going to be BlackBerry

19   Messenger communications, and we've been in contact with

20   defense about stipulating to the translations, which would

21   alleviate one witness, but for those, I intend to lay the

22   foundation and then admit them as a batch because there's more

23   than 200 of them.

24        THE COURT:  Okay.  Let me also mention that this

25   court is a little antiquated when it comes to video evidence.

1    There is yet -- as yet there is not equipment for the jury to

2    review video evidence in the back.  So what it has meant is

3    that the government has provided a clean laptop when it's time

4    for the evidence to go back.  The laptop can't have any other

5    things on it, obviously.  Then the admitted evidence and/or --

6    if -- if it's all electronic, at that point you might -- your

7    documentary evidence you might have prepared for the jury to

8    receive as paper.  You just showed it to them in the courtroom,

9    but if there are things like videos that get admitted that you

10   want them to have, then you would need to provide a player for

11   them to be able to review it in the jury room.

12              MR. RADOVICH:  Your Honor, I'm assuming that's the

13   same for -- we don't have any video, but we do have audio that

14   we're going to be admitting.  So I'm assuming it would be the

15   same.

16              THE COURT:  Yeah.  And we have no equipment.  I don't

17   know why.  This has been a big issue for me.  It does seem that

18   the court should have its own equipment to play evidence for

19   the jurors, but whatever.  Right now that's where we are.

20              So let me ask Mr. Feitel, from the joint pretrial

21   statement and the exhibit lists, I did not see any defense

22   objections to the anticipated exhibits.  So I just want to

23   check in with you.  The government has provided a little chart.

24   The objection column is blank.  Is that because you haven't had

25   a chance to look it or because you truly do not object?

1          MR. FEITEL:  Your Honor, in an effort to try to

2     facilitate the trial moving forward, the parties met this

3     week -- Monday of this week -- and I went through some of the

4     questions that I have about certain exhibits.  I wanted to

5     discuss them with my client.  The other thing is since the last

6     trial exhibit list came out, the government, I think, has added

7     to it -- or at least it seemed to me they added to it.  It

8     could be that I worked off the old list.

9          So I have some questions about some of the photographs

10    the government wants to introduce in evidence.  There's -- it's

11    not a lot, and mostly it's an objection about whether it's

12    cumulative or it involves personal information involving my

13    client.  But by and large, the overwhelming bulk of the

14    government's evidence are the emails and the BlackBerry

15    communications.  And there's -- I don't have a principle basis

16    to object to them, assuming they've been authenticated.

17         And as Mr. Radovich said, we're going to try to work on

18    stipulating about authenticity of those, and perhaps about the

19    chemist as well.  I mean, the chemist's testimony is probably

20    even more riveting than the government's opening.  There's

21    always one juror who's really fascinated by, you know, the mass

22    spectrometry test that they do, but for the most part, no one

23    really cares about any of that.  And I'm not sure it's an issue

24    in this case.  So I am trying to resolve the bulk of the things

25    that can be stipulated, you know, in a professional way.  And

1     if I have objections to specific exhibits, I'll lodge them

2     early next week.  It won't be more than a handful.

3              THE COURT:  That would be great, because my general

4     practice and hope is that objections to evidence that everyone

5     was aware of, that has been recorded in the joint pretrial

6     statement, will be made prior to trial, because I really don't

7     like to have to focus on that during the trial proceedings.

8     And I may, in fact, be stricter about this than some of my

9     colleagues that would prefer not to have to do the work

10    upfront.  I would like to do the work upfront to determine

11    whether these things are admissible rather than to do them at

12    trial.

13         And in other cases I've actually deemed objections

14    waived with respect to evidence that had been provided by one

15    party or the other, that I had given them an opportunity to

16    object, and the representation was made that there was no

17    objection, and so to make an objection during trial as to

18    evidence that I thought was fine and nobody objected to is a

19    problem -- is a problem.

20         So please do review everything, figure out what it is

21    that you would like to bring to the Court's attention and let

22    me know so that I can rule on them.

23         Mr. Radovich, let me talk to you about your witness

24    list.

25              MR. RADOVICH:  Yes, Your Honor.

1          THE COURT:  You have 15 witnesses, including 12 fact

2     witnesses and 3 experts.  Am I right about that?

3          MR. RADOVICH:  That is correct.  There's a

4     possibility that we may call somebody from the jail to testify.

5          THE COURT:  So we might have a plus one?

6          MR. RADOVICH:  Yes, as -- as an authentication

7     witness, and -- and then potentially a witness in rebuttal, but

8     likely that would be the case agent, who is already on the

9     witness list.

10          THE COURT:  All right.  And, of course, only if the

11     defense puts on a case.

12          MR. RADOVICH:  Right.  Of course, Your Honor.

13          THE COURT:  Okay.  All right.  What would be helpful

14     to me is on the first morning of evidence in the trial, if you

15     could give me -- maybe even not the first morning.  Maybe the

16     first morning of trial, if you would give me the order in which

17     you expect to call the witnesses.  I understand if changes need

18     to be made as the trial progresses, but it's just helpful to

19     know how these people are coming in as I think about the

20     testimony and what to expect.  Oh, along with the expected

21     amount of time that you think their testimony will take.  Just

22     a little list or a chart or something would be good.

23          MR. RADOVICH:  Okay, Your Honor.  Very well.

24          MR. FEITEL:  Your Honor.

25          THE COURT:  Yes.

1          MR. FEITEL:  I'm wondering if Your Honor would

2    consider asking the government to provide the list of witnesses

3    the day before because it impacts the defense because I need to

4    prepare.  There's a lot of juggling to do.  The *Jencks* material

5    won't be produced until we discuss it this weekend.  And so

6    it's -- it's a lot better, and the trial will go quicker, if I

7    can prepare for the right witness.  The worst is if I prepare

8    for a witness -- and I understand that things happen.  That's

9    part of life.  But to the extent that we can get the list a day

10   before, I promise I'll try to be briefer, which --

11          THE COURT:  Mr. Radovich, is that doable?

12          MR. RADOVICH:  Yes, Your Honor, that's a reasonable

13   request.  There's no problem there.

14          THE COURT:  So we're starting on a Tuesday because of

15   my travel schedule, and I apologize for that.  So maybe the

16   Monday we'll get this witness list to both -- to the Court and

17   to the defense.

18       Okay.  Now, regarding the expert witness testimony,

19   there are three experts that the government has identified.

20   Have their reports or whatever been provided to the defense?

21          MR. RADOVICH:  Yes, they have, Your Honor.

22          THE COURT:  Do I have those?

23          MR. RADOVICH:  Yes -- yes, you do, Your Honor.  We

24   filed them with the expert disclosures.

25          THE COURT:  Okay.

1          MR. RADOVICH:  They should be on the docket.  And we

2     did file those under seal.

3          THE COURT:  All right.  So we can know what these

4     folks have to say.  And, Mr. Feitel, I haven't seen any

5     challenges to their qualifications or methods or anything like

6     that.

7          MR. FEITEL:  Your Honor, since I -- I did prepare for

8     this morning, the government's expert notice document is

9     captioned Document 49 --

10          THE COURT:  Uh-huh.

11          MR. FEITEL:  -- in the Court's archive, and it's --

12     there's no, I don't believe, principled objection to the

13     qualifications.  I don't know Agent Hanratty, who's the

14     DEA agent to testify about certain things, but I do know the --

15     the interpreter.  And so I'm working -- Ms. O'Brien.  So I'm

16     working to try -- Your Honor may recall, my client has been out

17     of the jurisdiction like -- I don't mean to be disrespectful to

18     Piedmont, Virginia -- but in the middle of nowhere from my, you

19     know, perspective.  And so now that she's here, I'm going to

20     talk to her about some of this.

21          It may well be that there won't be expert testimony from

22     the chemist or from the linguist.  I think the government is

23     going to reserve its right to call the Drug Enforcement agent

24     expert, and I generally like to toy with those people on

25     cross-examination.

1    THE COURT:  Well, you know what would be really

2    helpful, as the Court tries to prepare for this trial, is given

3    that you are now sort of all focused on the evidence that's

4    coming in, the objections that you might make, the negotiations

5    that you might have, in the context of your filing next week,

6    Mr. Feitel, after you've had a chance to talk to your client,

7    it would be good if you can also notify the Court regarding

8    things like this:  So here are the exhibit challenges that we

9    really haven't been able to work out; here's what I'm objecting

10   to with respect to whatever expert.  Just so I'm not caught by

11   surprise with respect to any of these kinds of conflicts.  And

12   that way I can narrow down the focus and -- and determine what

13   has changed from the joint pretrial statement at this point

14   with respect to the parties' disputes.  Does that make sense?

15        And I know you have to talk to your client.  So once

16   you've had a chance to do that, you'll have a better sense of

17   what the government is really going to challenge and then you

18   should let me know.

19        MR. FEITEL:  Yes, ma'am.

20        THE COURT:  Okay.  All right.  Are there any other

21   expert materials, Mr. Radovich, that are not on the docket that

22   you may have exchanged with the defendant and you haven't

23   really posted?

24        MR. RADOVICH:  There would be, Your Honor.  So, for

25   example, the DEA bench chemist, her -- her lab notes, that --

1    basically how she tested in the lab, those have been disclosed

2    to Mr. Feitel and the defendant, but there's no need to post

3    those on the docket.  I can provide those to you.

4            THE COURT:  Well, if they don't provide a basis for

5    any challenge -- I mean, if Mr. Feitel is going to ultimately

6    challenge her, then I should have everything.

7            What -- what I'm -- I'm thinking about my civil cases.

8    So what I do in civil cases is I know that the parties don't

9    ordinarily mark, for example, the entire portions of deposition

10   testimony.

11           MR. RADOVICH:  Correct.

12           THE COURT:  But I ask them if they can give me the

13   deposition testimony of all the witnesses because I want to

14   know what these people are likely to say, as sort of background

15   for me as I'm thinking about and listening to their testimony.

16   So to the extent that you have -- and I was going to ask you

17   about, like, FBI 301s or whatever that have not been marked as

18   exhibits or -- you know, you obviously exchanged them in

19   discovery, but I wouldn't have access to them.

20           MR. RADOVICH:  Right.

21           THE COURT:  Those sorts of things, it would be

22   helpful for me to get from the government.

23           MR. RADOVICH:  Okay.  So for our DEA drug expert,

24   Special Agent Hanratty, he's not going to have -- because he's

25   not associated with this case at all, he doesn't have any

1    reports or DEA 6s about this particular investigation.  It's

2    just based on his training and experience as a DEA agent in

3    Mexico and other places in Latin America.

4         For our expert linguist, she has testified in -- on

5    numerous occasions.  We do have her trial transcripts.  No

6    deposition transcripts, but trial transcripts we could provide

7    to the Court, if that would be helpful.

8              THE COURT:  In other cases?

9              MR. RADOVICH:  In other cases.  Not in this case.

10             THE COURT:  No, that's all right.  I mean, you know.

11             MR. RADOVICH:  And then for the DEA bench chemist, I

12   don't have any of her transcripts, but her -- her testimony is

13   going to be I received an exhibit, I examined it, it tested

14   positive for methamphetamine.

15             THE COURT:  Okay.  That's fine.  That's fine.

16        I mean, with respect to your fact witnesses, you have 12

17   fact witnesses.  Are there witness statements that are floating

18   around somewhere that I am not -- has not -- is not part of

19   either your exhibits or something that I would have seen?

20             MR. RADOVICH:  So we did provide the Court back in

21   January a binder of witness statements and reports for fact

22   witnesses that relate to the subject matter of this case.

23             THE COURT:  I'll have to find it.

24             MR. RADOVICH:  We can -- we're happy to provide

25   another copy for the Court.  We did -- as I noted in the

1    ex parte motion that I filed, we did sub one witness.  And so

2    you have a witness who is not going to testify, and I need to

3    provide you new materials for the witness that is going to

4    testify in their place.

5           THE COURT:  All right.  So why don't you give me

6    those materials.  In the meantime, I've had a clerk change.  So

7    I don't know where things are, but we will look for the binder

8    that you are mentioning, and if we can't find it, we'll let you

9    know.

10          MR. RADOVICH:  Very well, Your Honor.

11          THE COURT:  Okay.  All right.  I need to revisit one

12   issue; that I know, since we had sort of geared up for trial

13   earlier and then it was pushed off, I am aware that I had

14   previously consented to the parties' request that they do their

15   closing arguments after my instructions.  I am revisiting that

16   determination and would -- I'm happy to hear from you as to the

17   significance and importance of it, but I will tell you that I

18   now have experience since we last talked about it.  And I have

19   been less than pleased with the scenario of the Court having

20   provided instructions and then the parties having an

21   opportunity to interpret those instructions for the jury

22   without giving -- without the Court having the sort of final

23   say as to what the law is.

24          MR. RADOVICH:  Your Honor, I've given that some

25   thought.  I think that we should sort of change our position

1   and have the instructions go last.  Therefore, if there's any

2   dispute about what is said in closing arguments, the jury knows

3   that -- that your instructions control and you can instruct

4   them on that properly.

5              THE COURT:  Mr. Feitel.

6              MR. FEITEL:  For this I'd like to come to the

7   lectern.

8              THE COURT:  Please.  Which one would you prefer?

9              MR. FEITEL:  Somehow I like standing closer to

10  Your Honor.  I think it does serve -- can you hear me?

11             THE COURTROOM DEPUTY:  I can turn it off.

12             THE COURT:  Yes.

13             MR. FEITEL:  I can use the --

14             THE COURT:  You're ready?  That's fine.  He's going

15  to use the lapel.

16             MR. FEITEL:  So not to pry, but can Your Honor tell

17  me the experience that you have which seems formative, because

18  you changed your mind.  Was it in a criminal case?

19             THE COURT:  Yes.

20             MR. FEITEL:  Was Your Honor's concern about who might

21  have been -- whose interpretation of the -- of the instructions

22  was less than consistent with the instructions, was that with

23  defense counsel?

24             THE COURT:  Yes.

25             MR. FEITEL:  It -- it pains me to have to ask these

1    questions.  You know, I -- Mr. Radovich knows.  I do pride

2    myself on being a principled attorney.  I really do not stray

3    outside the confines of what I understand the instructions to

4    mean, and it just pains me that one of my colleagues somehow

5    managed to change Your Honor's mind about this and then I'm

6    the -- you know, I'm the beneficiary of the bad news, but I can

7    sort of see -- I've been in a case where I've seen defense

8    attorneys give their own spin on what the jury instructions

9    mean.

10            And so better safe than sorry, I'll -- I'll consent to,

11    Your Honor, doing it, what I consider to be, the old-fashioned

12    way, but I will try to comport myself in a way so there won't

13    be any need for what Your Honor said to be inconsistent with

14    what I'm telling the jury.  Mostly what people like to do with

15    these, they like to play with the reasonable doubt instruction.

16    I've seen people have a list of what reasonable doubt is, and

17    there's sort of a hierarchy of things.

18            And if Your Honor was in a trial with the same person

19    that I was in who did that, I could see why you might be less

20    than comfortable letting defense counsel interpret the meaning

21    of reasonable doubt or burden of proof, but I'll -- I can -- I

22    can sort of see why, Your Honor --

23            THE COURT:  All right.  So I appreciate your consent.

24    And as a concession from my standpoint, I promise to have the

25    instructions pinned down in sufficient time so that you will

1    know what it is that I'm going to tell people.  And when you

2    give your closing arguments, you can say the judge will tell

3    you X with some certainty.  It's just the risk is -- I'm not

4    suggesting that you would do this.

5              MR. FEITEL:  I can guarantee Your Honor that I will

6    not.

7              THE COURT:  And I appreciate your representations and

8    I believe you.

9              MR. FEITEL:  I definitely will not.

10             THE COURT:  It's better all around if you-all give

11   your vigorous closing arguments, however you would like to give

12   them, and then the Court says, "Okay.  You've heard what

13   they've said, but now let me tell you what the law is

14   concerning this case."

15             MR. FEITEL:  I appreciate Your Honor advising us

16   without objection.

17             THE COURT:  All right.  Thank you.

18        So we're going to have a final pretrial conference,

19   which is scheduled for the Friday before at 10:30 a.m.  That's

20   going to be my opportunity to rule on outstanding matters.

21   Hopefully I will have a more robust discussion of the motions

22   that I'm about to give you the answers to, and we'll be able to

23   address any disputes that you have brought to my attention.

24        Again, between now and then I will issue a procedures

25   order that will contain an appendix that has my -- essentially,

1    my resolution of any disputes that I saw in the joint pretrial

2    statement concerning *voir dire*, for example.  It's my practice,

3    rather than having us waste the time of, sort of, going back

4    and forth is to take what you have given me, I see you want

5    this question, you object, I make the call, and then I prepare

6    a set of questions that represent my resolution of your

7    dispute.

8        You should consider that anything that I overrule with

9    respect to that is preserved as an objection.  So you don't

10   necessarily have to raise it again, but you will have the

11   opportunity, if you feel particularly strongly about anything,

12   at the final pretrial conference to say, "We see, you know,

13   your list of questions, Your Honor.  With respect to number 15,

14   I really think, you know" -- and we can talk about it and try

15   to resolve it.  But what you will get is my resolution of the

16   disputes that you have raised at this point.

17       All right.  With respect to the motions.  There are four

18   pending pretrial motions:  government motion *in limine* as to

19   other crimes, which is ECF No. 48; defendant's motion to

20   suppress emails, which is ECF 52; government's motion *in limine*

21   to use statements, and that's a sealed motion at 68; and

22   defendant's motion *in limine* to preclude defendant's recorded

23   jail phone call, which is the one we're going to -- the

24   government is going to respond to in writing, and that's

25   ECF No. 90.

1          First, let me just ask if there are any other motions

2     that are outstanding that I don't have on my list.

3               MR. RADOVICH:  Not from the government, Your Honor.

4               MR. FEITEL:  Not from the defense.  Although I think

5     the government -- we did discuss this week about whether the

6     government wants to not move forward with one of its motions,

7     but maybe I misunderstood.

8               MR. RADOVICH:  If I may, Your Honor.

9               THE COURT:  Yes.

10              MR. RADOVICH:  With respect to ECF No. 60, which is

11    the proffer statement motion.

12              THE COURT:  No. 68?

13              MR. RADOVICH:  60, six zero.

14              THE COURT:  Okay.  That wasn't one that I mentioned.

15              MR. RADOVICH:  Okay.  I misheard then.  68 then.

16              THE COURT:  Government -- is the sealed motion.

17              MR. RADOVICH:  The sealed motion.

18              THE COURT:  Yes.

19              MR. RADOVICH:  So the government's position, we're

20    still seeking to use certain statements.

21              THE COURT:  Yes.

22              MR. RADOVICH:  And we argued that motion, but not

23    statements that would -- would only be statements that resulted

24    from the defendant either putting on evidence or testifying.

25    And so we would limit it and not include, had we initially

 1    argued, whether cross-examination --

 2            THE COURT:  Right.  And so you're conceding or

 3    agreeing that -- or you're limiting your motion to the use of

 4    those statements if the defendant testifies or puts on

 5    affirmative evidence in contradiction of the statement?

 6            MR. RADOVICH:  Correct, Your Honor.  I couldn't think

 7    of an example of where it would -- where it could come in,

 8    whether on opening statement or through cross-examination of

 9    the government's witnesses during our case in chief.

10            THE COURT:  Previously you had said that.  And now

11    you're cutting back on that; is that what I'm suggesting?

12            MR. RADOVICH:  Correct, Your Honor.

13            THE COURT:  Okay.

14            MR. RADOVICH:  Correct.

15            THE COURT:  And I think, Mr. Feitel, that you had

16    previously represented that you were fine with the government's

17    current proposal, which is if there's affirmative evidence or

18    if the defendant testifies, you didn't have a problem; is that

19    correct?

20            MR. FEITEL:  Well, I think the law is abundantly

21    clear the government can do it under those circumstances, and

22    so this is what happens when reasonable people sit down and

23    talk about things and have a chance to work it out.  So I'm --

24    I'm completely in accord.

25            The government advised me when we met on Monday that

1    this is their position about it, and so I think that -- I don't

2    know if that renders Your Honor's decision moot, but I

3    understand the framework --

4           THE COURT:  Yes.

5           MR. FEITEL:  -- that we're -- that we're in front of.

6    And so I'm completely in accord with the government.

7           THE COURT:  All right.  So I think it may moot my

8    decision with respect to this because, as Mr. Feitel suggests,

9    I think that was the sort of baseline understanding of the law,

10   and the government's motion was seeking -- you know, a more

11   expansive view of when these statements could come in.  So if

12   it's all the same with you, Mr. Radovich, I think the motion is

13   moot.

14          MR. RADOVICH:  I agree, Your Honor.

15          THE COURT:  Okay.  Great.  One less thing for me to

16   worry about.  Excellent.

17       All right.  With respect to the motion to preclude the

18   phone call, you mentioned you're going to get your response in

19   this afternoon?

20          MR. RADOVICH:  We will, Your Honor, yes.

21          THE COURT:  Okay.  And would you like an opportunity

22   to reply, Mr. Feitel, or you want to just wait and argue it

23   orally at the final pretrial conference?

24          MR. FEITEL:  I think the prudent answer is it would

25   depend on what the government has to say, but if -- if I'm

1    going to respond, it'll be no later than -- today is Friday.

2    It will be no later than Tuesday of next week.

3              THE COURT:  All right.  So then we'll have that, and

4    I guess I will plan to -- if -- if you need -- is there any

5    reason you would need an answer sooner than at the pretrial

6    conference?  Mr. Radovich?

7              MR. RADOVICH:  Not from the government, and

8    whether -- the government hasn't decided whether we intend to

9    admit the statement or not, and depending on other rulings

10   today, it -- it may not matter as well.

11             THE COURT:  Okay.  So fine.  We'll address it at the

12   final pretrial conference based on what the parties submit

13   between now and then.

14        So with respect to the remaining motions.  As I

15   mentioned, I will give you my more robust statement at the

16   final pretrial conference.  But with respect to the government

17   motion *in limine* as to other crimes, that's ECF No. 48, that

18   motion is going to be denied in part and granted in part as

19   follows:  The Court holds that the evidence of bribery will be

20   admitted for the limited purposes set out in Federal Rule of

21   Evidence 404(b); that the post-indictment statements regarding

22   transportation of drugs by aircraft will also be admitted for

23   the limited purposes set out in Rule 404(b); and the evidence

24   relating to any drug operations in the Democratic Republic

25   of Congo will be excluded as not admissible under Rule 403.

1      I know the government has also mentioned its theory that

2      this evidence -- these pieces of evidence or types of evidence

3      that I've just discussed are intrinsic and that, therefore,

4      there wasn't really even a need to request the Court's

5      permission.  At this point, the Court doesn't have sufficient

6      information to rule on whether it qualifies as intrinsic.  So

7      you should prepare for trial under the assumption that the

8      evidence of bribery and the post-indictment statements will be

9      admitted only pursuant to 404(b) with adequate limiting

10     instructions concerning it.

11         If the government would like the Court to revisit that

12     determination, it can file a supplement to its motion *in limine*

13     providing additional information with details regarding these

14     two categories of evidence.  As an example of what I have in

15     mind, let me refer you to Chief Judge Howell's approach in a

16     case called *United States v. Apodaca* --

17         MR. FEITEL:  *Apodaca*.

18         THE COURT:  *Apodaca*.  You're familiar with it.  Which

19     is Docket 14-cr-57.  And ECF 94 in that case is the supplement

20     by the United States regarding its motion *in limine*, and it

21     provides additional information that -- permitting the Court to

22     make the necessary determinations regarding the intrinsic

23     nature of the information; all right?  So that's what's going

24     to happen with that one, and, again, I'll give you my full

25     explanation when we meet again.

1      With respect to defendant's motion to suppress emails,

2  which is ECF 52, the Court is holding that the defendant's

3  motion to suppress is denied.  And the general basis is the

4  good faith exception to the exclusionary rule, and the request

5  for an evidentiary hearing is also denied.

6      Now, I had been prepared to also rule on 68, but we just

7  discussed it.  And so it sounds as though that motion is moot.

8  So I don't need to resolve it.

9      With respect to the two other motions, as I said, I will

10  lay out my reasoning so you'll have something for the record.

11  But as far as trial is concerned, that's -- that's what we're

12  going to do; okay?

13      Let me just do some of the -- if there are -- turns out

14  there are evidentiary objections, you -- I may need to rule on

15  them during trial once I've seen how the evidence is introduced

16  or whatever.  Definitely, I mean, you're welcome to make your

17  objections in real time, and I will ask you to come forward, if

18  necessary, but I appreciate that you are trying to confer and

19  limit these types of issues.

20      In my trial procedures order, you'll see some details as

21  to trying to resolve issues and then filing a paragraph or

22  something if you aren't able to the night before, you know, at

23  the end of the trial day so that I can get it and we can talk

24  about it in the morning, the next morning.  So definitely

25  review that and follow that, if necessary.

1          Finally, with respect to the joint pretrial statement.

2     So I do see that you have a few disputes about the jury

3     instructions.  I'm not going to get into detail with respect to

4     that -- those now.  But we do have to pin down pretty clearly

5     the preliminary instructions, the statements of the case, and

6     that -- *voir dire*, obviously, and we will have a charging

7     conference during the trial, and we may -- it may be in more

8     than one session, if it looks like it's going to take some time

9     to kind of hammer out the substantive instructions.  The way my

10    process works is at some point -- trying to think of the timing

11    of this, and I don't want to get it wrong.  I don't want to

12    misrepresent.

13         But I will be circulating to you a version of jury

14    instructions that you need to review and that represents my

15    resolution, if I can, of the disputes that you've already

16    identified so that we're all working off the same draft.  I

17    will ask that you pay careful attention to the preliminary

18    instructions in particular because those are the ones that I

19    give at the beginning, and we can talk about those, hopefully,

20    at the final pretrial conference to pin down what I'm going to

21    say for *voir dire* and in the preliminary instructions.

22         And then we'll also begin the conversation with respect

23    to the issues that you think are still remaining with respect

24    to the substantive jury instructions, the final jury

25    instructions.  I have over time now developed my own way of

1    instructing the jurors with respect to, like, the standard

2    D.C. pattern instructions.  I've looked at those instructions,

3    so I have standard instructions on note-taking versus -- you

4    know, of the jury and all that stuff that you will see, and it

5    follows the substance of the D.C. -- but I just kind of say it

6    in a way that I'm comfortable with so they all flow together

7    and that kind of thing.  You'll see it all.  No surprises.  But

8    you don't have to sort of worry about those kinds of things.

9         The ones that are most important are going to be the

10   substantive instructions that are particular to this case

11   regarding the charges.  So those are the ones that everybody

12   needs to focus in on, and we'll start to have discussions

13   beginning at the final pretrial conference regarding disputes

14   about the characterization of the elements, et cetera,

15   et cetera; all right?  And then we'll carry those through.  And

16   sometimes we'll do them at the -- you know, trial is over at

17   4:30, we might stay until 5:30, if there are jury

18   instruction -- I know my staff gets very upset with me because

19   I sometimes do this after hours, but I don't know when else

20   we're supposed to do it.  And I don't want to keep the jury

21   waiting.  So -- so, yes, we will have those conversations just

22   to sort of make sure we can get to a final set of instructions

23   that accurately reflects the law.

24        So that said, is there anything about, right now, the

25   statement of the case?  I see the parties disagree with the

1   wording.  Do we feel -- does either side feel strongly about

2   this enough that you want to bring something to my attention

3   now, or do you want to wait until I've generated my -- my

4   version?

5           MR. RADOVICH:  Your Honor, I think it may be helpful

6   to see your version.

7           THE COURT:  So I'll just go through and look at these

8   and hammer it out and send it to you, and then at the final

9   pretrial conference we'll start the conversation about what --

10  any remaining objections.

11          MR. RADOVICH:  Understood, Your Honor.

12          THE COURT:  Does that make sense?

13          MR. FEITEL:  Yes, ma'am.

14          THE COURT:  All right.  And I'll do the same thing

15  with *voir dire*.

16          And you talked about stipulations.  What is your

17  practice or thought on introducing stipulations?  Sometimes the

18  parties will stipulate to things that I just take care of in

19  the context of the jury instructions.  You know, these are the

20  final elements of the -- of the crime.  Ladies and gentlemen of

21  the jury, the parties have agreed that Elements 1 and 2 are

22  satisfied in this case.

23          Sometimes the parties actually prepare statements and

24  introduce them as evidence in order to -- I don't know.  They

25  stand at the podium and they read into the record the

1    stipulation concerning Elements 1 and 2.  There's two different

2    ways of doing it.  Mr. Radovich.

3            MR. RADOVICH:  Your Honor, I don't think there will

4    be a stipulation as to the elements of the offense.

5            But for our stipulations right now, we've reached two

6    stipulations for the chain of custody for two seizures of

7    methamphetamine and the chemists' -- qualifications of our

8    expert chemists, DEA chemists.  Those, I think, would be

9    helpful to have you read when -- at a relevant point in the

10   trial to the jury; just something -- and we've drafted those,

11   but something to the effect of the parties have agreed that --

12   that had a chemist testified in this matter -- or that a

13   chemist received this substance and they tested it and it

14   tested positive for methamphetamine.

15           THE COURT:  All right.  If you prepare them and if

16   they're joint statements, after Mr. Feitel reviews them, if you

17   could get those to me so that I can have them, and then I will

18   also rely upon you at whatever relevant point in the trial that

19   you think they should be introduced to flag it for me so that I

20   can then read it; all right?

21           MR. RADOVICH:  Understood.

22           THE COURT:  Okay.  And I will, as I said, generate a

23   jury instructions document, what I call the initial

24   distribution draft, and get it to you so that you can start

25   thinking about the arguments you want to make about the jury

 1    instructions.

 2            You've agreed on a verdict form, and I will plan to use

 3    that form unless the need for changes arise as we talk about

 4    the law pertaining to the case.

 5            All right.  That's all I have.  Have I answered all of

 6    your questions, or do you have some other issues you would like

 7    to raise?

 8            MR. RADOVICH:  Your Honor, two things from the

 9    government.  First, the government has an additional *voir dire*

10    question that we'd like to propose to the Court.  If the

11    Court --

12            THE COURT:  Do you want to give it to me as a notice,

13    or do you want --

14            MR. RADOVICH:  We can file it to you as a notice.  I

15    don't think there will be an objection from plaintiff.  We've

16    already sent him over a copy of it, but we can file it as a

17    notice on the docket.

18            THE COURT:  Why don't you tell me what it is now.

19            MR. RADOVICH:  It's a jury instruction about the sort

20    of interpretation of electronic -- or not the interpretation.

21            MR. FEITEL:  About viewing.

22            MR. RADOVICH:  About viewing electronic evidence.  If

23    anybody has strong feelings on the government --

24            MR. FEITEL:  It's a *voir dire* question.

25            MR. RADOVICH:  -- conducting surveillance.

1    MR. FEITEL:  You said jury instruction.  It's

2    *voir dire.*

3    MR. RADOVICH:  It's *voir dire.*  Did I say jury

4    instruction?

5    MR. FEITEL:  Yeah.

6    THE COURT:  *Voir dire* question --

7    MR. RADOVICH:  Right, regarding --

8    THE COURT:  -- to the panel?

9    MR. RADOVICH:  Right.  Regarding the -- if any of

10   them have strong feelings regarding the government conducting

11   surveillance -- electronic surveillance and --

12   THE COURT:  I see.

13   MR. RADOVICH:  -- telephone calls.

14   THE COURT:  All right.  Why don't you give me the

15   language, and if Mr. Feitel doesn't object, we'll put it in.

16   MR. RADOVICH:  The second thing, from the

17   government's perspective -- I think this is unlikely, but I'll

18   just raise it with the Court and perhaps have a plan -- is in

19   the unlikely event this case were to go into a third week,

20   which is the week of Christmas.  So I think that's something we

21   should take into account when questioning the jurors to make

22   sure that they're potentially available.  And then depending on

23   the defense case and length of jury deliberations, there is a

24   possibility that it could spill over into sort of that -- that

25   Christmas week.

1          THE COURT:  So the court's availability that week --

2     not personally, but the entire court is limited --

3          MR. RADOVICH:  Right.

4          THE COURT:  -- because the entire court is in recess.

5     When is the Christmas recess?  Christmas Eve -- starts on

6     Christmas Day through the rest of the week, until after

7     New Year's, yeah.

8          So yes.  I mean, I think we do need to sort of focus on

9     the tricky nature of the schedule.  This might also necessitate

10    a few more jurors than we otherwise would have because of the

11    timing.  The number one reason, obviously, that people are,

12    like, I can't serve is because of the interaction with their

13    own schedules.  And it becomes even harder when you're talking

14    about a holiday scenario.

15         I will say then -- this is helpful.  I'm glad you raised

16    this issue, because my ordinary practice -- and this sort of

17    makes it even harder for you to manage *voir dire* -- is that

18    when a panel members comes to the bench and we're talking to

19    them individually and the first thing they say is, you know,

20    "I'm okay for the week and a half that you said this case is

21    going to be, but on the 23rd of December, I'm -- I have

22    tickets.  I'm flying to Milwaukee."  If it's that kind of

23    scenario and it looks like it might be a problem in terms of

24    the schedule, my typical practice is to move that person down

25    to the bottom of the list.  I don't cut them, but I bring them

1    down, and we ordinarily never get to them because you're

2    ultimately doing your pulls from the beginning of the list

3    really.

4         I don't know if there's going to be like a zillion of

5    those because of holiday schedules.  And so maybe we should be

6    thinking about how -- what your advice to me would be related

7    to people who say, "I would really like to serve on this trial,

8    but I don't know that I can commit to the time given -- given

9    the holiday schedule."

10        So you don't have to think about it now, but we'll put

11   that on the agenda for discussion on the -- at the final

12   pretrial conference so that we'll have some, hopefully,

13   reasonable and consistent rule about what to do with folks who

14   make that kind of representation.

15             MR. RADOVICH:  Thank you, Your Honor.

16             THE COURT:  Okay.  Anything else, Mr. Feitel?

17             MR. FEITEL:  No.  Thank you for your time this

18   morning.

19             THE COURT:  All right.  I will see you-all on -- what

20   is it?  What day do we come back?  Friday, December 6th.

21        Thank you.

22             (The proceedings were concluded at 11:46 a.m.)

23

24

25

1          <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 15th day of November, 2021.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25