# Appendix A

## ADOPTED INEFFECTIVE ASSISTANCE FACTS, IN PART, CONTINUANCE TO PETITIONER'S REPLY TO GOVERNMENT'S OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255

In 2012 or early 2013, through a recommendation and accompanied by another person, I was introduced to Commander K. Eduardo Ortiz, also known as Ruiz Carlo. We were looking for some missing young students; several people were helping. I will omit part of what happened because at the time they did not want to listen to me, but it had nothing to do with drugs or anything illegal.

(It turned out that this commander knew about the matter and already had people arranged.) From that moment on, I was forced to cooperate with him, supposedly to help with his work. He wanted to know how I had obtained that information, which I never revealed. From then on, he began to make my life miserable.

At one point, I was buying clothes in Tepito (Mexico City) when he urgently called me. He used to set people up within his jurisdiction (central Mexico) in order to arrest them and then settle things for large sums of money.

I did agree to something that ultimately was never carried out because that was his plan; there was never any conspiracy.

At the end of April, he sent me to speak with someone in Palmira, Colombia. I went, but I refused to talk and told the young man that I actually wanted to go see a doctor because I was very limited due to a recent car accident in Mazatlán. I entered Colombia without difficulty through immigration. However, when trying to leave, the young man "Yoni" kept taking me around in circles and could not "find" the airport. I called Culiacán, worried, and told the travel agent: "I'm going to miss my flight, get me out of here urgently, something feels wrong." I demanded to go to Bogotá.

When I presented my passport (in my name), the agent told me I had to wait because someone wanted to speak with me. Then I received a call from Commander J. Eduardo Ortiz (Ruiz),

threatening me that if I didn't do what he asked, the people I would be looking for in Sinaloa would be my own children. I became frightened. I asked if there was a problem with my passport. He said no. I waited for three hours and was about to miss my flight. I complained, and they took me to an immigration office against my will. During that time, the commander threatened me three more times.

After about another hour, they took me outside, and Colombian prosecutors were waiting for me. They said someone was coming to speak with me. Later, DEA agent Davys Crofth arrived. He gave instructions, and I had to sleep in the office because he did not return that day. The next day I was taken to a detention center. Later, I spoke with him and told him everything about the commander and that he was part of the Mexican Navy. He reacted indifferently. I asked for help and requested to speak with the head of the prosecutor's office. The Colombian consulate did not want to deport me, and they had to conduct a formal process where I requested my deportation.

Meanwhile, the commander in Mexico continued threatening me.

When I arrived in the U.S., I lost contact with the agents but kept looking for them because my children were in danger. After about two days, I was introduced to Chief Arturo Wayt, who speaks perfect Spanish. I was afraid to speak openly because there were many people present and it was a sensitive issue. He asked if I had somewhere to stay in Washington; I said no. He said I would be taken to a detention center. I asked why, but he did not answer.

**(Section 2)**

No one ever explained what an indictment was. I simply signed a paper they said was for handling my case. I spent 36 hours in "interviews" with prosecutors (including Cole and Michael). Whenever I asked questions, I was told: "A grand jury has already declared you guilty," even when I asked basic things like going to the bathroom or eating.

I bought a phone with an Arizona area code to speak with my children. One day, my child told me the commander—"my friend"—had called offering to help them get humanitarian visas and that he would supposedly get me a lawyer. I was terrified because only my children had that number. He was in contact with them constantly.

I informed Vanegas and sent a letter to the court, but no one responded. This went on for over seven months. Every time I had a hearing, he called my children. Eventually, after I mentioned him and tried to tell the truth, he became angry and even answered my children's phone once when I called them.

Days later, authorities abducted my children. My two oldest sons were murdered, burned, and dismembered in their car. You can imagine what I went through. A week later, my lawyer Vanegas came to see me, offered condolences, and apologized. He told me the government budget did not cover a translator and that the last translator had quit due to lack of payment. He also informed me that Judge Ketanji Brown Jackson would assign me another lawyer.

**(Section 3)**

R. Feitel appeared with investigator Suarez (who translated). They never explained what the conspiracy was. They claimed I had been under investigation since 1997. I asked why they never approached me earlier, and they gave no answer. I asked what happened in 1997; they never explained. (That year I had breast surgery for cysts—my family provided proof.)

They claimed there were many witnesses and evidence. They never explained their defense strategy. Feitel showed me a call recording that was unintelligible and mocked me. I asked about my legal situation and to speak with Arturo Wayt, but they ignored me and kept insisting I was guilty.

They pressured me to plead guilty, but I refused. Another investigator was assigned—more humane but still provided little information. After my sons were killed, they assigned me a psychologist, then sent me to a mental hospital in Texas for three months. The psychologist concluded I was mentally sound and simply grieving.

My mother hired an attorney from Arizona, but Feitel did not allow him to take the case.

**(Section 4)**

Feitel was not bilingual and never understood my case. He did not keep me informed and became impatient when I spoke. I requested evidence review and a case evaluation, but he

ignored me. I asked for a Spanish-speaking lawyer; he refused, saying he was the best lawyer in Washington.

When my mother became ill with cancer, I begged him to review my case. He yelled at me to stop crying. I filed complaints with the court requesting a Spanish-speaking attorney, but I received no response.

Later, I was punished in detention based on false claims that I spoke English—allegedly told by my lawyer Tony Axam. I was denied phone privileges for a month. My lawyer also contacted my family to authorize withdrawing documents I had submitted, which they never approved.

Tony Axam never communicated properly with me or my family and handled appeals without informing me. He later said he would handle my §2255 motion, but I refused.

**(Section 5)**

Regarding attorney Tony Axam: he attempted to charge me for helping with my appeal. A man named José Olmeda contacted me claiming to be connected to Axam. When I said I had no money, he suggested I sell my house. Later, Axam referenced this in a call. When I said I could not sell it, his attitude changed. Olmeda then fabricated a story about making a movie about my life.